**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Jimmy Delton PETTY and Joe Martin
Nunez-Quintela, Defendants-Appellees.**

No. 78–3276.

United States Court of Appeals,
Fifth Circuit.

Aug. 31, 1979.
Rehearing Denied Sept. 21, 1979.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellant.

Lawrence L. Barber, Jr., Monahans, Tex., for Petty.

Warren Heagy, Odessa, Tex., for Nunez-Quintela.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

This appeal involves review of the district court's order granting appellees' motion to suppress evidence derived from a search of the car in which they were riding. Appellees Jimmy Petty and Joe Nunez-Quintela were indicted for possession of a quantity of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), after United States Border Patrol officers discovered approximately 190 pounds of marijuana in their car's trunk. Prior to trial appellees moved to suppress this evidence claiming that the stop and subsequent search of the car which led to discovery of the marijuana were unsupported by reasonable suspicion and probable cause and, consequently, violative of the Fourth Amendment. The district court granted the motion, finding that the Border Patrol lacked reasonable suspicion for the initial stop of the car, and the Government appeals. We reverse.

*Facts:*

In large measure this case is about Bullis Gap Road, a 63-mile length of unpaved, public road running northeast through ranch country, canyons, rimrock and a small mountain range between United States Highways 385 and 90 in an area just north of Big Bend National Park in southwestern Texas. In this area, Highway 385, a paved highway, runs in a north-south direction from the eastern entrance of Big Bend National Park to Fort Stockton, Texas, passing through Marathon, Texas where it intersects Highway 90, another paved highway. Highway 90 runs east and west across Texas, forming a right angle with Highway 385 at Marathon. Bullis Gap Road joins Highway 385 roughly 30 miles north of the Mexican border and 32 miles sought of Marathon and intersects Highway 90 roughly 40 miles east of Marathon and 15 miles west of Sanderson, Texas, tracing a rough quarter circle between the two paved roads. No other roads intersect or give access to Bullis Gap Road.

Uncontradicted testimony at the suppression hearing established that, except for the southernmost 12 to 14 miles, Bullis Gap Road, apart from being unpaved, is in terribly bad condition and in places "nearly impassable."[1] There are many low water crossings and large sandbars where water has washed sand across the road. There are no bridges. In addition, there are numerous deep holes in the road. Because of the extremely difficult terrain, people living there generally drive pick-up trucks or vehicles with four-wheel drive; conventional passenger cars are rarely seen on the road. It takes a four-wheel drive vehicle approximately two hours and forty minutes to drive the full length of the road at a maximum speed of about 30 miles per hour. However, by using paved Highways 385 and 90 one can go from the road's intersection with one highway to the road's intersection with the other in about an hour and a half. Because the northern three quarters of the road are so bad, the few residents living along the road rarely use the road to reach Highway 90, preferring to drive south to Highway 385 and then take Highway 385 to Marathon. There are no signs or markings at the road's southern end that indicate that it leads to Highway 90. The distance from the road's intersection with Highway 385 to Fort Stockton along Highway 385 is approximately 90 miles; by taking Bullis Gap Road to Highway 90, however, a traveler would add roughly 50 miles to the trip, making a total of 140 miles.

Throughout most of the year the road is very lightly traveled, used principally by the eight or so families who live there and a few absentee owners who visit occasionally. The road does receive relatively more use, however, during the hunting season which runs for about a week after Thanksgiving in November or December. The stop in this case occurred in June, not in the hunting season. Border Patrol officers are familiar with most of the residents along the road and their vehicles.

As stated above, the intersection of Bullis Gap Road and Highway 385 lies 30 miles north of the Mexican border. The nearest, manned port of entry on the border is at Presidio, Texas, located about 80 miles west of Big Bend National Park. In the vicinity of the Park there are eight unmanned ports of entry and numerous spots where the Rio Grande is easily forded. The events in this case took place in June when the river is passable. In January 1965 the Border Patrol established a checkpoint on Highway 385 five miles south of Marathon. During the 1977 fiscal year 302 aliens who entered the United States illegally were apprehended at this checkpoint.

Several weeks before June 21, 1978, Hugh Rushton, the Assistant Chief of the Border Patrol stationed in Marfa, Texas, notified Border Patrol Officer Albert Pagitt, who was stationed in Sanderson, that he had on two different occasions received information that Bullis Gap Road was being used by motorists to circumvent the checkpoint

1. Tr., p. 11.

on Highway 385. Accordingly, Officer Pagitt asked various people living along the road if they had seen any strangers and requested that they telephone him if they saw any strangers or suspicious vehicles on the road.

On the morning of June 21, Pagitt received a telephone call from a friend who lived near Bullis Gap Road and who had helped him on previous occasions to the effect that there were two cars, one light blue and the other dark blue or black, driving north on Bullis Gap Road with one person in each car. The cars were traveling about 100 yards apart and from their location at the time of the call Pagitt estimated that they would reach Highway 90 within an hour and a quarter to an hour and a half. He immediately began preparation to stop the two cars when they reached Highway 90, enlisting the aid of Officers Forrest Fisher and Robert Munoz of the Border Patrol and Officers Charles Lowrance and Randy Mills of the Texas Department of Public Safety.

Fisher and Munoz took up a position on Bullis Gap Road about .7 of a mile south of Highway 90, while Pagitt and the two DPS officers established an observation point on the road approximately 1.4 miles south of Highway 90. When a light blue car with two passengers passed the observation position, Pagitt directed Fisher by radio to stop it and then drove south for roughly four miles in search of the second car. Although Pagitt did not see another car at that time, the dark blue car was eventually located about 20 miles south of Highway 90 where it was stuck in a low water crossing.

At the time of the stop, however, not having seen a second car or dust from a car, Pagitt returned to where Fisher and Munoz had stopped the light blue car and its occupants, appellees Petty and Nunez-Quintela. After Fisher reported that appellees had no key to the car's trunk, Pagitt had a conversation with Petty who had then gotten out of the car. In response to Pagitt's ques-

tions, Petty stated that they were coming from the area of Big Bend National Park and that they were going to Fort Stockton. Petty said that there was no other car with him and that he had seen no other car on the road while he had been on it. Petty was talking very rapidly, while Nunez sat in the car saying nothing and looking straight ahead.

In plain view on the car's back seat were an inflated spare tire, a jack, a lug wrench and a CB radio which was not operational. There was a functional CB radio in the front seat. The officers noticed no camping equipment in the car. When asked about the spare tire, Petty mentioned something about a flat tire and said that he had borrowed the spare tire and not put it back in the trunk. He explained that he had gotten the car from his wife and did not have the trunk keys. Pagitt testified at the hearing that, after a second inquiry about the keys, Petty "told us that there was nothing in the trunk, and said go ahead and break it open if we wanted to but there was nothing in it." [2] There is no evidence in the record to contradict Pagitt's testimony that Petty voluntarily offered to permit the officers to break open the trunk in order to allay suspicion and verify that it was empty.

Although Pagitt had the necessary tools to force open the trunk, he declined to use them as he "didn't want to just break the man's trunk open when I could go through the back seat without tearing anything up." [3] Therefore, when Petty said he was going to Fort Stockton by way of Sanderson, Pagitt suggested, "Well, let's—how about going on into my office and we'll look, go through the back seat." [4] The Border Patrol's Sanderson office is only 100 yards past the road to Fort Stockton on Highway 90. Petty and Nunez-Quintela, who were not under arrest at this time, then drove their car to Sanderson followed by the Border Patrol and DPS officers in other cars. On reaching Sanderson, Pagitt

2. Tr., p. 31.

3. *Ibid.*

4. Tr., p. 32.

and DPS Officer Mills removed the back seat of the Petty car and found the marijuana in the trunk. The officers then read Petty and Nunez-Quintela their rights and called the Drug Enforcement Administration.

*Discussion:*

The proper analysis in this case requires a two-step inquiry: first, to determine whether there was reasonable suspicion for the initial stop of appellees' car, and second, to determine whether the subsequent search was justified either by appellees' consent or by probable cause.

*A. The Stop*

■ The landmark case governing roving patrol stops is *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), which dealt with stops to investigate the presence of illegal immigrants. In reliance on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court held that, even in the absence of probable cause to search a vehicle or arrest its occupants, "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." 422 U.S. at 881, 95 S.Ct. at 2580. The standard for conducting such a stop is less stringent than "probable cause to believe the suspects guilty of a crime." *Id.* at 880, 95 S.Ct. at 2580. Rather officers on roving patrol may stop vehicles "if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582. Beyond limited questioning regarding the suspicious circumstances, "any further detention or search must be based on consent or probable cause." *Id.* at 882, 95 S.Ct. at 2580.

By conditioning stops on the existence of reasonable suspicion motorists are protected from "potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* at 882, 95 S.Ct. at 2581. *See also Delaware v. Prouse,* —— U.S. ——, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The Court in *Brignoni-Ponce* articulated a number of factors that officers may consider in determining the existence of reasonable suspicion. Among them are "the characteristics of the area in which they encounter a vehicle, [i]ts proximity to the border, the usual patterns of traffic on the particular road, . . . previous experience with alien traffic . . ., recent illegal border crossings in the area, [t]he driver's behavior . . ., obvious attempts to evade officers . . ., [a]spects of the vehicle itself, . . ., an extraordinary number of passengers, or . . . persons trying to hide." 422 U.S. at 884–85, 95 S.Ct. at 2582 (citations omitted). In evaluating the inferences to be drawn from observable facts, "the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Ibid.*

Although we have in recent years had occasion to apply the *Brignoni-Ponce* test in a wide variety of factual situations, including many cases from the vicinity of Big Bend National Park, *e. g., United States v. Carroll,* 5 Cir., 1979, 591 F.2d 1132; *United States v. Saenz,* 5 Cir., 1978, 578 F.2d 643, *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979); *United States v. Villarreal,* 5 Cir., 1978, 565 F.2d 932, cert. denied, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978), it is the nature of this area of the law that "[e]ach case must turn on the totality of the particular circumstances." *United States v. Brignoni-Ponce,* 422 U.S. at 885 n.10, 95 S.Ct. at 2582; *United States v. Rivera,* 5 Cir., 1979, 595 F.2d 1095, 1098; *United States v. Villarreal, supra,* 565 F.2d at 937.

We begin our evaluation of the facts in this case by distinguishing it from the two cases on which appellees principally rely, *United States v. Frisbie,* 5 Cir., 1977, 550

F.2d 335, and *United States v. George*, 5 Cir., 1978, 567 F.2d 643. *Frisbie* and *George* both involved stops on Texas State Highway 118 which runs north from the western end of Big Bend National Park to Alpine, Texas.

In *Frisbie* the Border Patrol detected three vehicles headed north on Highway 118 between 6:30 a. m. and 7 a. m. and stopped all three, discovering marijuana in the third. We listed the suspicious circumstances advanced by the Government as follows:

> [t]he direction the vehicle was traveling, the likelihood that the vehicle was coming from an unpatrolled river area, the difficulty the driver had in stopping the vehicle, the sparsely populated area where the stop occurred, [the officers'] knowledge that local traffic did not normally travel the roads in question at such early hours of the morning and that the route in question was frequently traveled by persons transporting illegal aliens and contraband, with such activity taking place primarily in the late evening and early morning hours.

550 F.2d at 337.

Given that Highway 118 is one of the two main roads leading away from Big Bend National Park, we concluded that "approval of a stop of this nature, founded upon dubious 'suspicious' circumstances of such slight import would result in subjecting the thousands of tourists visiting the area to unreasonable detention whenever they travel at hours when certain routes are less frequented." *Id.* at 338. Similarly, in *George*, Border Patrol officers stopped a Buick Electra with Georgia license plates traveling north at 1:45 a. m. when they recognized neither the car nor its solitary occupant and saw no camping equipment in the car. 567 F.2d at 644–45.

■ The major and, in our view, critical distinction between *Frisbie* and *George* and the instant case is the great difference between Highway 118, a paved highway and one of the major arteries leading to Big Bend National Park, and Bullis Gap Road, an unmarked, unpaved, nearly impassable stretch of road whose northern end is rarely used even by its own residents driving pick-up trucks and four-wheel drive vehicles. In this respect the facts in the case at bar are considerably more favorable to the Government than they were in two recent cases in which we upheld investigative stops on Highway 118 and Highway 385, respectively. *United States v. Villarreal, supra; United States v. Almand*, 5 Cir., 1978, 565 F.2d 927, *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

The record establishes that, except during hunting season, Bullis Gap Road receives little use and its northern three-quarters almost none. The record further demonstrates that, due to the rugged and difficult terrain, those who do drive on the road generally use pick-up trucks or vehicles with four-wheel drive. Thus, however sparse the total traffic on the road, the number of ordinary passenger cars is even less. The families living along the road are known to each other and to the Border Patrol, as are their vehicles. Indeed, traffic is generally so meager that residents immediately notice the presence of outsiders. No signs or markings at the intersection of Highway 385 and Bullis Gap Road indicate that the road leads to Highway 90.

In light of these facts, the presence of passenger cars on Bullis Gap Road outside of hunting season is inherently much more suspicious than the use of Highways 118 and 385 at odd hours of the day. This factor in conjunction with the other circumstances surrounding the stop of appellees' car created reasonable suspicion sufficient to justify the stop. Officer Pagitt's friend, who had provided aid on prior occasions, reported that two cars were traveling north about 100 yards apart. However unusual one passenger car would be on Bullis Gap Road, the presence of two passenger cars, apparently traveling together and each with one occupant, was more unusual.

■ We have had occasion in previous cases to consider the use of cars in tandem or in a "lead car-load car" arrangement during smuggling operations. *See, e. g.,*

United States v. Resendez, 5 Cir., 1978, 578 F.2d 1041, 1044; United States v. Villarreal, supra, 565 F.2d at 936; United States v. Barnard, 5 Cir., 1977, 553 F.2d 389, 392; United States v. Escamilla, 5 Cir., 1977, 560 F.2d 1229, 1234. While this factor alone does not justify a stop, e.g., United States v. Barnard, supra, 553 F.2d at 392; United States v. Escamilla, supra, 560 F.2d at 1234, it is nonetheless a circumstance that "may understandably raise the officer's suspicions." United States v. Barnard, supra, 553 F.2d at 392; United States v. Villarreal, supra. The officers could have inferred that there was some connection between the cars from the fact that two passenger cars were traveling close together along a road rarely used by any passenger cars. Although only the light blue car appeared at the north end of Bullis Gap Road, Pagitt, knowing the condition of the road, could reasonably have suspected that the other car had suffered a mishap en route. As discovered later, the dark blue car had in fact become stuck in a stream bed.

There are other significant circumstances surrounding the stop of appellees' car that contribute to the reasonableness of Pagitt's suspicions. The road led away from the Mexican border in an area where there were eight unmanned ports of entry and numerous places where the river was easily fordable. See United States v. Brignoni-Ponce, supra, 422 U.S. at 884–85, 95 S.Ct. at 2582; United States v. Almand, supra; United States v. Villarreal, supra; United States v. Lujan-Miranda, 5 Cir., 1976, 535 F.2d 327. Although appellees' car was stopped roughly 95 miles from the Mexican border, the Border Patrol could properly have assumed that it came from the border area since the only point of access to the road's southern end is the intersection with Highway 385 which lies 30 miles north of the border. Compare United States v. Escamilla, supra. Highway 385 is a route known to be used for illegal aliens and smuggling, e.g., United States v. Villarreal, supra; United States v. Payne, 5 Cir., 1977, 555 F.2d 475, 478; United States v. Lujan-Miranda, supra, and the Border Patrol had information that Bullis Gap Road was being used to evade the checkpoint on Highway 385 south of Marathon. E.g., United States v. Brignoni-Ponce, supra; United States v. Sarduy, 5 Cir., 1979, 590 F.2d 1355, 1357–58.

The Border Patrol officers were entitled to evaluate these circumstances in the light of their experience and to draw reasonable inferences therefrom. United States v. Brignoni-Ponce, supra, 422 U.S. at 885, 95 S.Ct. at 2582; United States v. Villarreal, supra, 565 F.2d at 936 n.4. We conclude that the totality of the circumstances in this case, taken in the aggregate, was sufficient to create reasonable suspicion to justify an investigative stop.

B. The Search

Having decided that Officer Pagitt's decision to stop appellees' car was supported by reasonable suspicion, we now consider whether the subsequent search of the car's trunk was warranted either by consent or probable cause. See United States v. Brignoni-Ponce, supra, 422 U.S. at 882, 95 S.Ct. at 2580.

1. Consent

It is well established that a party can waive his rights under the Fourth Amendment and consent to a search provided, of course, that the consent represents an "essentially free and unconstrained choice." United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). See also United States v. Almand, supra, 565 F.2d at 930.

In the instant case, unchallenged testimony at the suppression hearing established that Petty not only consented to the search but actually suggested that the officers break open his trunk in order to convince themselves that it was empty. The only reason that the search was conducted at the Sanderson Border Patrol Office rather than at the situs of the stop was that Pagitt did not want to do damage to Petty's trunk. Neither of appellees testified at the

hearing. However, there was no evidence that Petty at anytime withdrew his consent or objected to going to Sanderson or to the removal of the back seat. When asked on cross-examination why he had not sought to procure a warrant to search the car Officer Pagitt replied, "We had received permission from Mr. Petty to open the trunk."

Our careful reading of the record has revealed no suggestion that Petty did not give his consent to the search or that his consent was the product of coercion, overt or subtle. Under these circumstances we are compelled to conclude that the search took place pursuant to a valid consent.

*2. Probable Cause*

Even if Petty had not consented to the search, however, it was supported by probable cause and therefore lawful. An automobile's mobility is an exigent circumstance permitting a search without a warrant so long as there is probable cause. *Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

The test for probable cause is whether " 'the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been [or is being] committed.' " *United States v. Tuley,* 5 Cir., 1977, 546 F.2d 1264, 1267, *cert. denied,* 434 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977), *quoting Stacey v. Emery,* 97 U.S. 642, 645, 24 L.Ed. 1035 (1878). *See also Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1948). In determining whether there is probable cause to believe a vehicle contains contraband, "we look to the totality of the circumstances and the inferences that flow therefrom." *United States v. Clark,* 5 Cir., 1977, 559 F.2d 420, 424, *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977).

In this case we find that, when coupled with the circumstances known prior to the stop, the information gleaned from Pagitt's conversation with Petty and observation of Petty's car provided probable cause to conduct a search. Petty confirmed that he and Nunez-Quintela had come from the area of Big Bend National Park and stated that they were going to Fort Stockton. This admission significantly heightened the unusual nature of Petty's presence on Bullis Gap Road since, by turning off Highway 385, which leads directly to Fort Stockton, on to the road, he added at least 50 miles distance and considerable time to the trip. This supports the inference that Petty and Nunez-Quintela were trying to avoid the checkpoint at Marathon. Petty offered no explanation of his choice of this unpaved route over the shorter, paved road available to him, and the officers observed no camping equipment or other material that would tend to explain appellees' presence in such a desolate and remote area.

Petty denied having seen the dark blue car on the road. While it is possible that Pagitt's friend had seen a light blue car other than Petty's driving with a dark blue car, Pagitt could reasonably have concluded that this was most unlikely given the paucity of traffic on the road. The more plausible explanation was that Petty had something to hide. The fact that an inflated spare tire, a jack, and a lug wrench, items ordinarily kept in the trunk, were on the car's back seat in plain view could arouse suspicion that something was hidden in the trunk. *See United States v. Hosch,* 5 Cir., 1978, 577 F.2d 963, 966. Petty's statement that he had no key to the trunk because he had borrowed the car from his wife could, under the circumstances, further support the inference that he was hiding something in the trunk.

The presence of a disconnected CB radio on the back seat and an operational CB radio in the front could lend support to the notion that Petty's car had been traveling in tandem with another car and that the extra CB radio had come from the other car. Finally, appellees' demeanor added to the suspicious circumstances; Pagitt testi-

fied that Petty was "talking very rapidly,"[5] while Nunez-Quintela remained in the car "just sitting looking straight ahead."[6] Given the totality of the circumstances in this case, together with the reasonable inferences to be drawn therefrom, we conclude that the Border Patrol officers had probable cause to search the car.

Having found that the initial stop was based on reasonable suspicion and that the subsequent search was justified both by Petty's consent and by probable cause, we reverse the grant of appellees' motion to suppress and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.