**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joe Lucero LEYBA,**
**Defendant-Appellant.**

**No. 79–1607.**

United States Court of Appeals,
Tenth Circuit.

Argued July 8, 1980.

Decided Aug. 15, 1980.

year statute was unnecessary to the holding, we do not believe our decision there governs the instant case.

Thomas S. Udall, Asst. U. S. Atty., Albuquerque, N. M. (R. E. Thompson, U. S. Atty., Albuquerque, N. M., with him on the brief), for plaintiff-appellee.

Tova Indritz, Asst. Federal Public Defender, Albuquerque, N. M., for defendant-appellant.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Joe Lucero Leyba (Leyba) was convicted, after trial to the Court, of knowingly transporting undocumented aliens in violation of

8 U.S.C.A. § 1324(a)(2). Leyba appeals, alleging District Court error in its failure to suppress evidence obtained as a result of the stop of his automobile by agents of the United States Border Patrol. No challenge as to the sufficiency of the evidence underlying the conviction is raised.

Early in the morning of April 8, 1979, Border Patrol agents Oscar Martinez and Lawrence Nelson were preparing to set up a temporary traffic check point on U.S. Highway 180 north of Cliff, New Mexico. At approximately 2:55 a. m. a portable sensing device, located about two miles south of the proposed checkpoint, detected the presence of a northbound vehicle. Realizing that inadequate time remained to complete the checkpoint, the agents pulled their vehicle onto a side road and positioned it on a slight knoll, perpendicular to U.S. Highway 180. As the Leyba vehicle approached, the Border Patrol agents illuminated the passing automobile with their lights. The car, a silver and black 1977 Charger Daytona, contained three individuals in the front seat and several in the back. It appeared to be "riding fairly heavy on the road" and bore Arizona license plates.[1] Believing the car to possibly contain undocumented aliens, Martinez and Nelson followed the vehicle. During this interval, the agents observed that the rear windows of the car were fogged up and that the vehicle itself was intermittently drifting across the center line of the highway. Although the agents illuminated the Charger with their bright lights on at least one occasion, they were unable to distinguish passengers in the rear of the Leyba car. This left the agents with the impression that the passengers were "slouching down" to avoid detection. In fact, they were reclined in their seats sleeping.

Both Martinez and Nelson are experienced Border Patrol agents. Each has worked as an agent in southwestern New Mexico for more than five years. Martinez has worked similar checkpoints in the Cliff, New Mexico area one hundred times or more.

U.S. Highway 180[2] is considered a major artery for smuggling undocumented aliens from Mexico, northward. During the year prior to Leyba's arrest, 1,163 undocumented aliens were apprehended on Highway 180. Agent Martinez testified that the majority of alien trafficking on Highway 180 took place between 2:00 a. m. and 7:00 a. m.— hours during which traffic at the point of the stop averaged only one or two cars during the entire period.[3] In contrast, the average daily traffic on Highway 180 from Silver City to the Route 78 turnoff was 1,031 vehicles per day in 1978. Just southeast of Cliff, New Mexico, there averaged 1,071 vehicles per day; at the town of Cliff on Highway 180 an average of 1,473 vehicles per day was observed, and just north of Cliff, New Mexico, traffic on Highway 180 averaged 878 vehicles per day. Of these vehicles, 14.1% were passenger cars with out-of-state license plates. Officer Martinez, based on past experience, estimated that fifty percent of the smugglers apprehended were driving vehicles bearing out-of-state plates.

With these observations in mind and based on their past experience, the agents stopped Leyba's vehicle. The stop occurred at approximately 3:00 a. m., two and one-half miles north of Buckhorn, New Mexico. An official of the New Mexico Highway Department testified that by the shortest route it is 116.2 miles by road from the United States-Mexico border to Cliff, New Mexico. The distance from Cliff to Buckhorn, according to official state highway maps, is eight miles. Thus, the stop occurred approximately 124.2 road miles north of the United States-Mexico border. The distance in air miles from the United

---

1. The Arizona-New Mexico border is approximately twenty-two miles from the point of the stop.

2. U.S. Highway 180 is characterized in the federal highway system as a federal primary route—a classification second only to an interstate highway.

3. Leyba testified that he had not seen any cars on Highway 180 in the hour before he was stopped.

States-Mexican border is between 90 and 100 miles.

Between the point of the stop and the closest point of the border at least two major towns exist—Deming, New Mexico, population 8,343, and Silver City, New Mexico, population 7,751. In addition Highway 180 is transected by various roads including a major cross-country interstate highway—Interstate 10. Highway 180 itself runs directly from El Paso, Texas to the Cliff-Buckhorn area and northward.

Following the stop, the agents questioned Leyba and his passengers about their citizenship and learned that four of the passengers had entered the United States without inspection, and met Leyba at a prearranged site north of Columbus, New Mexico. Leyba was arrested, and subsequently charged with four counts of knowingly transporting undocumented aliens in violation of 8 U.S. C.A. § 1324(a)(2). At trial, Leyba moved to suppress any testimony of or about the aliens under *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The District Court denied the motion, characterizing the issue as "very close" and "just barely . . . over the line of . . sufficien[t] articulable facts." [R., Vol. III, p. 137]. The testimony sought to be suppressed was admitted in evidence, and Leyba was convicted.[4]

## I.

### A.

■ The Fourth Amendment to the United States Constitution is "implicated in this case because stopping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [that] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Inasmuch as the Warrant Clause of

the Fourth Amendment does not apply to such stops, however, we need only decide whether the conduct survives the prohibition of "unreasonable searches and seizures". *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *United States v. Mendenhall*, —— U.S. ——, —— n. 2, 100 S.Ct. 1870, 1874, n. 2, 65 L.Ed.2d 497 (1980) (Powell, J., concurring). The reasonableness of such seizures, involving means less intensive than the traditional arrest, turns on a "balance between the public interest and the individual's rights to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam), *quoting, United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *United States v. Mendenhall, supra*, (Powell, J., concurring). At a minimum, this requires that the stop "be based on specific, objective facts indicating that society's legitimate interests require the seizure . . ., or that the seizure [was] carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–562, 96 S.Ct. 3074, 3083–3085, 49 L.Ed.2d 1116 (1976). In considering these issues, "courts need not ignore the considerable expertise that law enforcement officials have gained from their special training and experience." *United States v. Mendenhall, supra*, (Powell, J., concurring); *Brown v. Texas, supra*, 443 U.S., at p. 52, n. 2, 99 S.Ct. at p. 2641, n. 2.

■ In the immigration field, agents on roving patrol,[5] as here, may properly consider the following factors in determining whether there exist "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspi-

---

4. A judgment of acquittal was granted as to Count 3 of the indictment.

5. *Compare, Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (roving patrol search); *United States v.*

*Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (non-border search at traffic checkpoint); *United States v. Martinez-Fuerte, supra*, (stop and questioning at permanent checkpoint).

cion that the vehicles contain aliens who may be illegally in the country," *United States v. Brignoni-Ponce, supra,* 422 U.S., at p. 884, 95 S.Ct. at p. 2582, thus justifying the stop of a particular vehicle and the limited questioning of its occupants: (1) the physical characteristics of the area in which the vehicle is stopped; (2) patterns of traffic on the road; (3) proximity to the border; (4) previous experience with alien trafficking in the area; (5) information about recent border crossings; (6) attempts to evade detection; (7) appearance of the vehicle; (8) appearance and behavior of the driver and passengers; and, (9) other relevant information. *Id.* at pp. 884–885, 95 S.Ct. at pp. 2581–2582; *United States v. Sperow,* 551 F.2d 808 (10th Cir. 1977), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1971).

Our review of these factors is, of course, guided by the principle that "[t]he circumstances surrounding a stop 'are not to be dissected and viewed singly; rather they must be considered as a whole.' . . . In addition, these circumstances 'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.' " *United States v. Vasquez,* 612 F.2d 1338, 1343 (2d Cir. 1979), *quoting, United States v. Price,* 599 F.2d 494, 501 (2d Cir. 1979), and cases cited therein. "Each case must turn on the totality of the particular circumstances." *United States v. Brignoni-Ponce, supra,* 422 U.S., at p. 885, n. 10, 95 S.Ct. at p. 2582, n. 10.

### B.

■ In determining whether the facts known to the Border Patrol agents at the time of the stop were sufficient to give rise to a reasonably warranted suspicion that criminal activity was afoot, the District Court found it useful to refer to the factors enumerated in *United States v. Brignoni-Ponce, supra,* at pp. 884–885, 95 S.Ct. at pp.

2581–2582. We agree that the enumerations, while not exhaustive, are helpful in our consideration of the issue presented here.

Without detailing our assessment of each of the factors enumerated in *Brignoni-Ponce,* we hold that the stop of Leyba's car was proper under the Fourth Amendment. U.S. Highway 180 is a relatively light traveled road in a sparsely populated area. Average traffic at the time of the encounter (3:00 a. m.) is extremely light—one or two cars during the entire period between 11:00 p. m. and 7:00 a. m.[6] Leyba himself testified that, on the evening of his arrest, he had driven for one hour on U.S. 180 without seeing another vehicle.

Border Patrol statistics for the area indicate that extensive alien trafficking occurred in the year prior to the stop. The fact that the Border Patrol has maintained periodic checkpoints in the area for at least five years emphasizes this. According to the agents, such trafficking is much heavier between 2:00 a. m. and 7:00 a. m. While Highway 180 does lead directly to the border, we do not consider this factor alone especially significant inasmuch as, given the distance away from the initial encounter, the Leyba vehicle could have begun its journey substantially north of the border rather than at the border. This is, of course, but one fact in the entire formula.

Also of significance was the vehicle's and occupants' appearance. The agents could see that the Leyba vehicle was heavily loaded.[7] When they first encountered the vehicle, the agents observed three people in the front seat and several people in the back seat of an obviously crowded passenger sedan. Later, however, they were unable to detect the presence of passengers in the rear seat, justifiably leading the agents to conclude the occupants were slouching down in order to avoid detection. This, combined with the fogged rear window,

---

6. According to the testimony of agent Martinez. [R., Vol. III, p. 56]. Other witnesses testified that traffic averaged one to two cars per hour during this period. *E. g.,* R., Vol. III, pp. 22–25. In any event, traffic is very light.

7. This takes on some added significance because the car was equipped with adequate, as opposed to worn, shock absorbers.

reasonably led to the belief that the vehicle contained a large number of persons—clearly an unusual occurrence in a sparsely populated area very early in the morning. That the vehicle bore out-of-state plates, as do 50 percent of all vehicles in which aliens are apprehended, is of little significance here simply because Arizona is relatively near. It is, however, entitled to some limited consideration because agent Martinez did not recognize the vehicle as local traffic from the area. *See, United States v. Petty*, 601 F.2d 883, 887 (5th Cir. 1979).

Significant, too, is that the driver, as he was being followed by the Border Patrol vehicle, caused his vehicle to drift intermittently across the center line—movement which led the agents to believe that the driver was paying more attention to the car following than to the highway. *See, United States v. Saenz*, 578 F.2d 643, 647 (5th Cir. 1978), *cert. denied*, 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1975) (car swerved as defendant frequently glanced at rearview mirror).

Relying on *United States v. George*, 567 F.2d 643 (5th Cir. 1978) and *United States v. Frisbie*, 550 F.2d 335 (5th Cir. 1977),[8] Leyba contends that these facts, even in the aggregate, do not lead to a reasonable conclusion that criminal activity was afoot. Both *George* and *Frisbie* dealt with Border Patrol stops in the area around Big Bend National Park. A reading of the opinions makes it plain that the Court in both *George* and *Frisbie* was particularly concerned with the large tourist population visiting Big Bend National Park in striking the balance between individual privacy and the public interests involved. For example, in *Frisbie* the Court concluded that "approval of a stop of this nature, founded upon dubious 'suspicious' circumstances of such slight import would result in subjecting the thousands of tourists visiting the area to unreasonable detention whenever they travel at hours when certain routes are less frequented." *Id.* at p. 338. In a later case near the National Park, the Fifth Cir-

cuit commented that "[h]ad the events which transpired in Big Bend Park occurred anywhere else, a different result may have been reached." *United States v. Resendez*, 578 F.2d 1041, 1045 (5th Cir. 1978).

This is one critical distinction between *Frisbie* and *George* and the instant case. We have here travel early in the morning in an admittedly sparsely populated, lightly traveled region. The "balance between the public interest and the individual's right to personal security", *United States v. Brignoni-Ponce, supra*, 422 U.S., at 878, 95 S.Ct., at 2579, struck in *Frisbie* and *George* differs substantially from that which is presented here. *Accord, United States v. Petty, supra*, at p. 888. For this reason, we cannot apply *Frisbie* and *George* to the factual setting presented in the instant case.

One admittedly similar stop has come to our attention in a case which we believe requires discussion: *United States v. Lamas*, 608 F.2d 547 (5th Cir. 1979). The facts in *Lamas*, with two important exceptions, are strikingly similar to those in the case at bar. In *Lamas*, an experienced Border Patrol agent encountered a green and white 1966 Ford Galaxy "with flashy mirrors, a hood ornament, hub caps, and 'fuzzy balls' around the windows" on U.S. Highway 180 near Cliff, New Mexico. In the agent's opinion the vehicle did not look like the "typical tourist's car". It appeared to be heavily loaded and displayed Colorado plates. As the vehicle passed, the occupants avoided eye contact and slouched down in their seats. The Border Patrol stopped the vehicle just north of Cliff, New Mexico, shortly after noon.

At trial, the District Court denied Lamas' motion to suppress the evidence obtained as a result of the stop. On appeal, the Fifth Circuit reversed and ordered the evidence suppressed in a two to one decision.

Of course, the *Lamas* opinion, while persuasive, is not binding on us. Whether we choose to adopt its reasoning, however, must be left to another day, because, in our view, the facts presented here render the

---

**8.** Leyba also relies on *United States v. Olivares*, 496 F.2d 657 (5th Cir. 1974). *Olivares*, how-

ever, erroneously applied a probable cause standard to the stop.

two cases markedly distinguishable in significant respects. The stop here occurred at 3:00 a. m., when traffic is much lighter and the incidence of smuggling much higher. Additionally, the driver's behavior suggests support for the agent's actions. *United States v. Saenz, supra,* at p. 647, n. 5. Given these important, extra variables, we hold that the requirements of the Fourth Amendment have been met here.

### C.

Section 287(a)(3) of the Immigration and Nationality Act, 8 U.S.C.A. § 1357(a)(3) authorizes agents, without warrants, "within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance or vehicle . . . ." Under current regulations, this authority may be exercised anywhere within 100 air miles of the border, subject, of course, to the Fourth Amendment considerations contained in *Brignoni-Ponce* and its progeny. 8 C.F.R. § 287.1(a) (1980).

Leyba interprets this Congressional authorization as foreclosing searches beyond the 100 mile limit. We do not read Congress' intent as such. If Fourth Amendment considerations are met, such stops are permissible where "criminal activity is afoot." In any event, Leyba does not contest the Court's finding that the stop occurred less than 100 *air* miles from the United States-Mexican border. [R., Vol. III, p. 137].

WE AFFIRM.