F I L E D
United States Court of Appeals
Tenth Circuit

DEC 22 1997

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS
TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL HUEREQUE-MERCADO,

Defendant-Appellant.

Case No. 97-2009
(D.C. No.  CR. 96-376-HB)
(District of New Mexico)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **HENRY**, and **LUCERO**, Circuit Judges.

The defendant Daniel Huereque-Mercado appeals the district court's order denying his motion to suppress evidence discovered in Mr. Huereque-Mercado's pickup truck after a traffic stop by a roving border patrol agent.  He argues that the stop was not supported by reasonable suspicion and therefore violated the Fourth Amendment.  We disagree and therefore affirm the district court's decision.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. BACKGROUND

In an indictment filed in July 1996, the government charged Mr. Huereque-Mercado with possession of more than 100 kilograms of marijuana with the intent to distribute it, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Mr. Huereque-Mercado moved to suppress the evidence that a border patrol agent had discovered in Mr. Huereque-Mercado's pickup truck on June 9, 1996. The district court conducted an evidentiary hearing and denied the motion. Mr. Huereque-Mercado entered a conditional guilty plea, and the court sentenced him to sixty months' imprisonment.

As developed at the evidentiary hearing, the record indicates that Mr. Huereque-Mercado was stopped by United States Border Patrol Agent Joseph Muniz around 7:30 a.m. on June 9, 1996 as he proceeded north on New Mexico Highway 11, approximately twenty-one miles north of the Mexican border. Agent Muniz testified that, as he was driving south on Highway 11, he saw a late model pickup truck with Arizona plates heading north.

For several reasons, Agent Muniz suspected that the driver of the truck might be engaged in smuggling contraband into the United States from Mexico. First, he said, Highway 11 was a preferred route for smugglers because it allowed them to drive north and avoid I-10, the more heavily traveled and patrolled interstate highway. Also, a paved road intersecting Highway 11 runs parallel to the border between the United States and Mexico about three miles north of it, in some places passing within a quarter of a mile of

2

it. Additionally, the agent testified, the early morning is a preferred time for smugglers because border patrol agents change shifts then, and, as a result, there are fewer agents on the road.

According to Agent Muniz, the kind of vehicle that he saw also made him suspicious--"[p]ickups are a preferred type of vehicle that smugglers like to use because of their roominess." See Rec. vol. I at 57 (Tr. of Evidentiary Hr'g of Sept. 5, 1996). Agent Muniz also noted that the pickup had Arizona plates. "That caught [his] attention because Arizona is one of the more popular destinations for smuggling loads that [originate] out of the Columbus [, N. M.] area." Id.

Agent Muniz turned around and started following the truck as it proceeded north on Highway 11. He then observed that the pickup had a large chrome bumper and was missing one of its license plate lights. He explained that these observations provided further grounds for suspicion because he knew of several instances in which the bed of a pickup had been modified so that it could be used to transport contraband and in which the same type of bumper had been used to conceal the modifications. Id. at 57-58. Quite often, he added, smugglers who modify pickup beds fail to reinstall the electrical connections and, as a result, some of their vehicles' lights do not function. Id. at 58-59.

As he followed the pickup, Agent Muniz called for vehicle registration information. He learned that the truck was registered to two men from Phoenix (neither one of which was the defendant Mr. Huereque-Mercado) and that the vehicle had not

3

passed through one of the designated ports of entry into the United States. To Agent Muniz, both of these facts were suspicious. As to the addresses of the owners, he said that Phoenix was a popular destination city for smuggling. As to the fact that the truck had not passed through an official port of entry, Agent Muniz said that it was unusual because most people in the area usually drove into the border town of Palomas, Mexico to sight-see or shop. Id. at 60.

Finally, as he followed the vehicle, Agent Muniz noticed air-freshener hanging from the rear-view mirror. He explained that air-fresheners were frequently used to mask the odor of illegal drugs. Agent Muniz said that even drug smugglers hiding drugs in secret compartments in the back of pickups use air freshener, "maybe [because of] a sense of paranoia, that somebody can detect the odor." Id. at 62.

Based on all these facts, Agent Muniz stopped the pickup. As he approached it, he noticed a vinyl cover over the bed. He saw the driver's baggage in the cab, along with a CB radio, a cell phone, and a pager on the dashboard. There was a strong odor of air freshener. He questioned the driver, Mr. Huereque-Mercado, who said he was a resident alien and produced a resident alien card. Agent Muniz asked Mr. Huereque-Mercado who owned the truck, and the agent became even more suspicious when Mr. Huereque-Mercado, contradicting the information Agent Muniz had received over the radio about the truck's registration, said that he owned it.

4

Agent Muniz then asked permission to search the truck, and Mr. Huereque-Mercado agreed. He discovered several large packages wrapped in paper in the bed of the pickup and asked Mr. Huereque-Mercado what they contained. After Mr. Huereque-Mercado smiled and shrugged his shoulders, Agent Muniz placed him under arrest. Agent Muniz then brought his drug-sniffing dog over to the truck. The dog alerted to the packages in the back of the pickup, and Agent Muniz discovered that they contained 673 pounds of marijuana.

On cross-examination, Mr. Huereque-Mercado extracted several admissions that impeached Mr. Muniz's testimony to some degree. First, Agent Muniz admitted that there was no indication that Mr. Huereque-Mercado knew about the morning shift change of border patrol agents. Also, the agent explained that the shift change occurred at 6:00 a.m., significantly earlier than the 7:30 a.m. stop and arrest at issue here. Cross-examination also revealed that Agent Muniz had no idea what percentage of vehicles on Highway 11 had out-of-state plates, what percentage were pickup trucks, or what percentage of pickup trucks had large bumpers. He also admitted that the truck was not dusty or muddy, as it might have been if it had crossed the border by leaving paved roads to avoid detection.

Mr. Huereque-Mercado then called several witnesses in support of his motion to suppress. An engineer from the New Mexico Highway and Transportation Department testified that, in 1994, the average daily traffic count was 2,649 vehicles (north and south

5

bound) for the section of Highway 11 at issue in this case. See Rec. vol. II at 85 (Tr. of Evidentiary Hr'g of Sept. 5, 1996). For 1995, the projected traffic count was 2,714. See id. at 86. A service department manager for a car dealership testified that it is "quite common" for individuals buying pickups to order special bumpers that may be used for towing. See id. at 89. After examining a photograph of the bumper on Mr. Huereque-Mercado's pickup, the manager said that he had seen many like it. The manager also said that it was not unusual to find a pickup truck with a larger bumper that had only one license plate light. However, on cross-examination the manager admitted that there was no towing ball on Mr. Huereque-Mercado's truck and that, as a result, the large bumper did not appear to have been used for the most common lawful purpose.

Mr. Huereque-Mercado then presented testimony from two witnesses who had counted the passing vehicles on Highway 11 between approximately 7:00 and 8:00 a.m. at the location of the instant traffic stop. The first of these witnesses testified that on one morning she had counted forty-one vehicles, noting that twenty of them were pickup trucks, vans, or sport utility vehicles and that one or two of the vehicles had Arizona plates. See id. at 94-95. She also saw three border patrol vehicles.

The second of these witnesses testified that he had counted vehicles at the same time at the same spot on two other mornings. On the first of these mornings, he counted forty-five vehicles (including twenty-two vans, pickups, or sport utility vehicles; ten vehicles with either out-of-state plates, Mexican plates, or no plates at all; and five law

6

enforcement vehicles). See id. at 106-07. On the second morning, he counted fifty-three

vehicles (twenty-nine vans, pickups, or sport utility vehicles; thirteen vehicles with out-

of-state plates, Mexican plates, or no plates at all; and one border patrol vehicle). See id.

at 109-110.

At the conclusion of the evidence, the district court issued an oral ruling denying

Mr. Huereque-Mercado's motion to suppress. In its subsequent written order, the court

relied on the following factors in concluding that Agent Muniz had a reasonable suspicion

that Mr. Huereque-Mercado was engaged in criminal activity as he drove north on

Highway 11 on the morning of June 9, 1996:

> (1) New Mexico [H]ighway 11 is the only paved road in the
> area leading directly north from the United States-Mexico
> border and is a notorious smuggling passageway for both
> contraband and illegal aliens.
> (2) The time at which he first noticed Defendant's vehicle is the station shift
> change, a preferred time for smugglers to attempt to move
> contraband north.
> (3) The type of vehicle Defendant was driving is commonly
> used to smuggle drugs or aliens.
> (4) Defendant's vehicle had an Arizona license plate, which is [a] common
> destination for many illegal smuggling loads crossing the
> border.
> (5) The port of entry lane check indicated the vehicle had not
> come though the border.
> (6) An air freshener was hanging from the vehicle's mirror; such
> air fresheners commonly are used to mask the odor of illegal
> drugs.
> (7) Based on his experience, the vehicle's unusually large rear
> bumper and the missing rear license plate light indicated the
> bed of the truck may have been altered.

Rec. vol. I at 29-30 (Memorandum Opinion and Order filed Sept. 13, 1996).

## II. DISCUSSION

On appeal, Mr. Huereque-Mercado challenges the district court's conclusion that when he stopped the pickup Agent Muniz had a reasonable suspicion that Mr. Huereque-Mercado was committing a crime. He contests each factor relied on by the district court and the government, arguing that the stop violated the Fourth Amendment and the evidence seized should therefore be suppressed.

In reviewing the denial of a motion to suppress, we must accept the district court's factual findings unless they are clearly erroneous. United States v. Lopez-Martinez, 25 F.3d 1481, 1483 (10th Cir. 1994). We "must consider the evidence in the light most favorable to the government." United States v. Maestas, 2 F.3d 1485, 1490 (10th Cir. 1993). However, we review de novo the ultimate determination of whether a search or seizure is reasonable under the Fourth Amendment. Lopez-Martinez, 25 F.3d at 1483.

As the parties and the district court have noted, border patrol officers on roving patrol are not required to establish probable cause before making a traffic stop. See United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975). Instead, border patrol agents may make traffic stops upon a showing that "'they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity." United States v. Cantu, 87 F.3d 1118, 1121 (10th Cir.) (quoting Brignoni-Ponce, 422 U.S. at 884), cert. denied, 117 S. Ct. 265 (1996). The Supreme Court has explained that this

8

reasonable suspicion standard reflects a balancing of "the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border." Brignoni-Ponce, 422 U.S. at 881; see also Lopez-Martinez, 25 F.3d at 1483 (discussing Brignoni-Ponce).

In Brignoni-Ponce, the Court set forth a list of eight factors that border patrol agents may consider in determining whether there is reasonable suspicion to stop a vehicle near the border: (1) the characteristics of the area in which the vehicle is encountered; (2) the proximity to the border; (3) the usual patterns of traffic; (4) the agent's previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade the agents; (7) characteristics of the vehicle; and (8) the appearance that the vehicle is heavily loaded. Brignoni-Ponce, 422 U. S. at 884-85; see also United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir. 1990) (discussing these Brignoni-Ponce factors). This list is not exhaustive, and "[n]either Brignoni-Ponce nor its progeny identify a minimum number of factors necessary to constitute reasonable suspicion or any outcome-determinative criteria." Lopez-Martinez, 25 F.3d at 1484.

Instead, the determination of reasonable suspicion must be made by examining "the totality of the circumstances." Cantu, 87 F.3d at 1121 (citing United States v. Cortez, 449 U.S. 411, 417 (1981)). Border patrol agents are entitled to assess the facts in the light of their experience, and, as a result, we have recognized that they "may perceive

9

meaning in actions that appear innocuous to the untrained observer." Id. (citing Brown v. Texas, 443 U.S. 47, 52 & n.2 (1979)). Additionally, reasonable suspicion may be based on "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." Lopez-Martinez, 25 F.3d at 1484 (10th Cir. 1994) (citing Terry v. Ohio, 392 U.S. 1, 22 (1968)). Although "the necessary 'level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence,' the Fourth Amendment requires 'some minimal level of objective justification.'" Cantu, 87 F.3d at 1121 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting I.N.S. v. Delgado, 466 U.S. 210, 217 (1984))).

The reasonable suspicion analysis must be considered on a case-by-case basis, United States v. Martin, 15 F.3d 943, 950 (10th Cir. 1994), and cannot be reduced to "'a neat set of legal rules,'" Lopez-Martinez, 25 F.3d at 1484 (quoting Sokolow, 490 U.S. at 7). However, it is useful to consider some of our prior decisions in this area, beginning with those cases in which we have concluded that traffic stops made by border patrol agents comported with the Fourth Amendment.

In Lopez-Martinez, border patrol agents observed a van and a sedan exiting the interstate near the Mexican border and less than ten miles south of a checkpoint. The sedan left the interstate and proceeded on a state highway that was a known smuggling route. The agent following the vehicles noticed that there were four Hispanic men in the sedan. When the agent pulled in between the van and the sedan, the sedan dropped back

10

about 100 yards.  Both vehicles were driving about thirty miles per hour in a fifty-five miles per hour zone, and the agent saw a passenger in the van stare at the agent for twenty to thirty seconds and then drop back out of sight.  In affirming the district court's decision that the agent had the necessary reasonable suspicion that the vehicles were transporting undocumented aliens, we identified the following factors:   the characteristics of the area (the highway in question passed through minimally populated desert and was a slower and more circuitous route than the interstate and a large number of illegal aliens had been apprehended there);  the proximity of the area to the border; the usual patterns of traffic on the particular road (the record indicated that the time of the stop was a period of particularly low traffic); the officer's experience; and the behavior of the driver and passengers.

Similarly, in United States v. Barbee, 968 F.2d 1026 (10th Cir. 1992) we upheld the district court's finding of reasonable suspicion when the agents observed the defendant's car  traveling north on a known smuggling route and further observed the cars' passengers crouching down out of sight after the agents followed the car and shined their high beam lights on it.  We reasoned that two agents with experience in the area had testified about "the location of the road, the typical nature of the traffic at that time of year and that time of day . . . , and their experience with alien and drug smugglers." Barbee, 968 F.2d at 1029. We also emphasized the passengers' suspicious behavior. Several of our other decisions have followed reasoning similar to Lopez-Martinez and

11

Barbee in concluding that border patrol agents had reasonable suspicion to effect a brief investigative detention. See, e.g., United States v. Pollack, 895 F.2d 686 (10th Cir. 1990) (finding reasonable suspicion when a pickup truck passed through a checkpoint at 3:00 a.m., the driver asked for directions to the nearest gas station, and when, forty-five minutes later, sensors detected the same pickup traveling close to another vehicle on a highway that circumvented the checkpoint); United States v. Merryman, 630 F.2d 780 (10th Cir. 1980) (finding reasonable suspicion when the defendant's truck stopped before coming to a checkpoint and then made a U-turn and drove away, and when an agent following the truck then observed lumpy objects in the back); United States v. Leyba, 627 F.2d 1059 (10th Cir. 1980) (finding reasonable suspicion when officers observed defendant's car traveling north on a known smuggling route at 3:00 a.m., the car drifted over the center line on several occasions, and agents following the vehicle suspected that the passengers were attempting to avoid detection); United States v. Sperow, 551 F.2d 808 (10th Cir. 1977) (finding reasonable suspicion when agents observed a heavily-loaded truck with a camper traveling on an east-west highway close to the border and then turning north).

In contrast to these cases, other decisions illustrate the kinds of circumstances in which we have found that border patrol agents lacked reasonable suspicion. For example, in United States v. Guillen-Cazares, 989 F.2d 380 (10th Cir. 1993), agents observed two cars driving close together on a state highway that intersected I-25 near a checkpoint at

12

about 10:25 p.m. The agents noticed that the first car appeared to contain quite a few people and that the second car seemed to be riding a little low. As they approached the cars, one agent noticed that he could no longer see the passenger in the second car. We reversed the district court's conclusion that these facts established reasonable suspicion to stop the two cars. We noted that the facts in this case--a car turning south instead of north and the fact that the lead vehicle contained more people than the second car--did not fit the classic smuggling pattern described by the agents during their testimony at the suppression hearing. We said that "the fact [that the] defendant was traveling at night on a known smuggling road, with one passenger, in a vehicle which slanted to the rear and was following a car with several passengers" and "the fact [that] the passenger slouched down at some point after the car entered I-25 south, . . . do not reasonably warrant suspicion [that] the defendant's vehicle was smuggling aliens or narcotics." Guillen-Cazares, 989 F.2d at 384.

United States v. Monsisvais, 907 F.2d 987 (10th Cir. 1990) provides another illustration of facts failing to establish reasonable suspicion. Around 7:30 p.m., border patrol agents observed a pickup truck with a camper shell that was "riding extremely heavy" traveling north on a highway that bypassed an I-25 checkpoint. Monsisvais, 907 F.2d at 988. The truck had Arizona plates, and the agent said that as the truck approached the on-ramp to I-25 north, the driver slowed down, corrected his turn, and then turned onto I-25 south instead. The agent believed that the driver did this in response to seeing a

13

border patrol car. Upon considering this evidence, we reversed the district court's conclusion that the stop was supported by reasonable suspicion. We noted that the record was barren as to the legitimate uses of the state highway. We also attached little significance to the Arizona plate. We further reasoned that the driving maneuvers observed by the agents were not significant. We noted that according to the agents' testimony, they would have been suspicious whether the truck had turned north (the direction that smugglers usually travel) or south (the direction that smugglers travel when they think they may be under observation). We added that the agents had admitted that the intersection was confusing and that out-of-state drivers might well slow down for innocent reasons.

United States v. Miranda-Enriquez, 941 F.2d 1081 (10th Cir. 1991) provides a final example of border patrol agents' observations that we found insufficient to establish reasonable suspicion. In that case, agents observed a car with out-of-state plates traveling north at 9:00 p.m. along a state highway known for smuggling. They saw dust on the car as it passed by and noticed several unidentified shapes in the back seat. As he flashed his lights on the car when it passed though an intersection, the driver appeared "frozen" and did not look left or right. Miranda-Enriquez, 907 F.2d at 1082. In finding a lack of reasonable suspicion, we reasoned that the agent had acknowledged that it was not unusual for cars on the highway in question to be covered with dust, that the agent provided no specific information about the likelihood of encountering smugglers at the

14

time of day that the stop was made, and that little significance should be attached to the driver's failure to look left or right when the agent saw him because it was possible to see oncoming cars before reaching the intersection.

In applying these decisions to the instant case, we first note that in explaining his decision to stop Mr. Huereque-Mercado on the morning of June 9, 1996, Agent Muniz identified four of the factors listed by the Supreme Court in Brignoni-Ponce as grounds for reasonable suspicion: (1) the characteristics of the area in which he encountered Mr. Huereque-Mercado's truck (New Mexico Highway 11, a route preferred by smugglers, according to the agent's testimony); (2) the proximity of the area to the border (about twenty-one miles north of it); (3) the usual patterns of traffic on the road in question (i.e. the fact that he observed Mr. Huereque-Mercado at 7:30 a.m., a preferred time for smugglers, according to the agent); and (4) the characteristics of the vehicle (a pickup with a large bumper, a missing license plate light, and air freshener hanging from the rearview mirror). Although several of these factors may have appeared entirely innocent to the untrained observer, Agent Muniz was entitled to rely on his experience as a border patrol agent in concluding that the totality of the circumstances warranted further investigation. See Lopez-Martinez, 25 F.3d at 1484 (noting that a series of innocent acts may justify further investigation and that the border patrol agent may consider the totality of the circumstances in making the determination of whether he has the reasonable suspicion necessary to make a stop). Moreover, the factors identified by Agent Muniz in

justifying the stop are similar to those relied on by the border patrol agents in several of our prior decisions that have upheld the determination of reasonable suspicion. See Lopez-Martinez, 25 F.3d at 1485-86 (considering, inter alia, the proximity to the border, the time of day, the agent's testimony that the road in question was preferred by smugglers, and the fact that the defendant's van was able to conceal several passengers from passersby); Barbee, 968 F.2d at 1029 (considering, inter alia, the location of the road, the typical traffic, and the agents' experience with smugglers); Pollack, 895 F.2d at 690-91 (concluding that the time of day, the fact that the defendant was driving on a known smuggling route, and the fact that he was driving a large vehicle capable of hauling many people all supported a finding of reasonable suspicion); Lebya, 627 F.2d at 1063-64 (concluding that the time of day, the nature of the road, and the appearance of the vehicle supported finding of reasonable suspicion); Sperow, 551 F.2d at 880-881 (concluding that the fact that the defendant was driving a heavily-loaded truck a mile and a half from the border supported a finding of reasonable suspicion).

On the other hand, we acknowledge that some of the reasons offered by Agent Muniz as grounds for stopping Mr. Huereque-Mercado are of questionable significance in undertaking the reasonable suspicion analysis. In particular, several of our decisions have criticized the border patrol's reliance on a vehicle's out-of-state license plates as grounds for making a stop. See, e.g., United States v. Martinez-Cigarroa, 44 F.3d 908, 911 (10th Cir. 1995) ("[W]hile out-of-state license plates may be a relevant consideration in some

16

circumstances, this factor in and of itself is not significantly probative of illegal activity and adds little to the reasonable suspicion equation."); Monsisvais, 907 F.2d at 991 ("Although Arizona cars must certainly be less common on this stretch of road than those bearing New Mexico plates, we cannot find any basis in the record from which to conclude that Arizona-plated vehicles are any more likely to be transporting aliens . . . than are vehicles bearing the license plates of New Mexico, or, for that matter, Texas or Colorado."); Lebya, 627 F.2d at 1064 ("That the vehicle bore out-of-state plates, as do 50 percent of all vehicles in which aliens are apprehended, is of little significance here simply because Arizona is relatively near.").

Additionally, we agree with Mr. Huereque-Mercado that there are flaws in Agent Muniz's reasoning regarding the significance of the time of day when the stop was made. Although Agent Muniz testified that the early morning was a preferred time for smugglers because that was when border patrol agents changed shifts, he also stated that the shift change actually occurred around 6:00 a.m., an hour and a half before the stop at issue here. Moreover, as we have noted the testimony offered by Mr. Huereque-Mercado about the pattern of traffic on Highway 11 at the time when the stop actually occurred indicated that several agents were on patrol then, thus undermining Agent Muniz's suggestion that smugglers could more easily avoid encountering law enforcement agents by driving at that hour. Also, the testimony presented by Mr. Huereque-Mercado regarding special bumpers on pickup trucks indicated that such bumpers were more common and had more

17

legitimate uses than one might have concluded from Agent Muniz's testimony alone.

Finally, we note that unlike some of the cases in which we have found reasonable

suspicion, Agent Muniz did not provide specific information about the number of illegal

aliens or drug smugglers arrested in the area. See Lopez-Martinez, 25 F.3d at 1485 n.3

(considering agents statistical testimony about the number of undocumented aliens

arrested in the area).

Nevertheless, because we must consider the totality of the circumstances and view

the record in the light most favorable to the government, we conclude that the district

court properly held that the stop of Mr. Huereque-Mercado's truck was supported by

reasonable suspicion. Even though Mr. Huereque-Mercado established that some of the

factors on which Agent Muniz relied in justifying the stop were not as unambiguously

suspicious as Agent Muniz's testimony suggested, the district court was still entitled to

rely on that testimony to conclude that these factors provided some basis for reasonably

suspecting Mr. Huereque-Mercado of transporting contraband. Moreover, in comparing

the facts of the instant case to those decisions in which we have found an absence of

reasonable suspicion, we note that those other decisions did not involve the combination

of suspicious vehicle characteristics and other Brignoni-Ponce factors that is present here.

See Guillen-Cazares, 989 F.2d at 382 (vehicle traveling at night on a known smuggling

route and observed to be slanting toward the rear but no indication that it had been

modified to carry contraband); Monsisvais, 907 F.2d at 988 (vehicle "riding extremely

18

heavy" but no indication that agents identified any other suspicious characteristics); Miranda-Enriquez, 941 F.2d at 1082 (concluding that dust on a car was not grounds for suspicion and noting no other suspicious characteristics). After observing a pickup (with a large bumper, a missing license plate light, and air-freshener hanging from the rearview mirror) driving twenty-one miles north of the Mexican border on a highway thought by agents to be preferred by smugglers at a time thought by agents to be preferred by smugglers, and after receiving the information that the truck had not passed through a regular border checkpoint, Agent Muniz had a "'particularized and objective basis for suspecting [Mr. Huereque-Mercado] of criminal activity.'" Lopez-Martinez, 25 F.3d at 1487 (quoting Cortez, 449 U.S. at 417-18). Allowing border patrol agents to make a traffic stop when presented with this particular combination of factors does not vest the agents with unbridled discretion in violation of the Fourth Amendment.

## III. CONCLUSION

For the reasons set forth above, the decision of the district court is affirmed. The mandate shall issue forthwith.

Entered for the Court,


Robert H. Henry
Circuit Judge