**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Heriberto Fernandez MONSISVAIS, Defendant–Appellant.**

**No. 89–2187.**

United States Court of Appeals, Tenth Circuit.

July 3, 1990.

marijuana in his vehicle was the result of an illegal search and seizure.

## I

On February 17, 1989, Bruce Goad, an agent with the United States Border Patrol, was operating a Border Patrol checkpoint station on northbound Interstate 25 near Truth or Consequences, New Mexico. Agent Goad testified that at approximately 7:30 p.m. a sensor alarm alerted the checkpoint's officers to the presence of a vehicle traveling northbound on Highway 85, a route by which it is possible to bypass the checkpoint and which is commonly used to bypass the checkpoint. Agent Goad then looked over to Highway 85 and saw the headlights of appellant's northbound vehicle.

Accompanied by another agent, Goad drove north on I–25 in a marked Border Patrol car to Exit 83 in order to intercept the vehicle. Exit 83 was described by Goad as the point "where State Road 52 and Highway 85 meet, ... there's an on-ramp for I–25 north, or if they're going up the road or turning from 52 they can catch I–25 south." Goad elaborated that "there's three ways you can go right there at the intersection" and that the intersection is "somewhat" confusing and "[p]eople have gotten lost there."

Presiliano A. Torrez (William L. Lutz, U.S. Atty., with him on the brief), Asst. U.S. Atty., Albuquerque, N.M., for plaintiff-appellee.

Robert Ramos (Gary Hill with him on the brief), of Hill & Ramos, El Paso, Tex., for defendant-appellant.

Before SEYMOUR, BARRETT, and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

After filing an unsuccessful motion to suppress evidence, appellant Monsisvais entered a conditional guilty plea to possession of more than 100 kilograms of marijuana with intent to distribute. Mr. Monsisvais asserts on appeal that the discovery of the

Agent Goad testified that he stopped his patrol car at the intersection with his lights off and turned his headlights on again as appellant's vehicle drew near. Goad described the vehicle as a small Chevrolet S–10 pickup with a camper shell and noted that he could see two occupants in the cab. He said the vehicle was "riding extremely heavy. The rear end was real low on the vehicle, and the front of the vehicle was raised like there was a lot of weight in the rear...." Goad stated that he had previously found aliens concealed in pickup trucks with camper shells, and that the pickup had Arizona plates and "we don't get many Arizona vehicles on the old highway there."

According to Goad, appellant's vehicle slowed as it approached the intersection, and it

> appeared to [Agent Goad] that he [appellant] was going to take the on-ramp on to I–25 north, and I believe that when he saw the border patrol vehicle and the headlights, he corrected his turn. Instead of going on I–25 north he continued on up the old highway, and eventually took the on-ramp to I–25 south....

Goad added:

> It's not an uncommon practice for aliens or alien smugglers, either case may be, if they see the border patrol vehicle, they will sometimes instead of entering the freeway northbound in the direction they were going, they will continue up the old highway, if they are using Old Highway 85, and enter the freeway southbound, sometimes they will just continue on up Old Highway 85 'til it ends."

Goad further testified that, after noticing "the weight and the two occupants and the out-of-state plates, it kind of aroused my suspicions and we stopped the vehicle on I–25 southbound, pretty close to the exit." After questioning appellant as to his citizenship, Goad smelled "a very strong odor of marijuana" emanating from the camper shell. Goad then placed appellant and his passenger under arrest for possession of marijuana. After another agent arrived at the scene with a dog to verify the marijuana odor, the agents opened the camper shell and discovered the marijuana inside.

At the conclusion of the hearing on the Motion to Suppress, the district court announced its findings and conclusions from the bench:

> The Court finds that Agent Goad was working the T or C fixed checkpoint when they had a sensor alert on Highway 85, which is the old Highway 85 which now parallels I–25.
>
> That he observed a car proceeding north on 85. That he stationed himself at the intersection of 85, 52 and I–25.
>
> That—at least he perceived that when the vehicle noticed his presence, the vehicle continued on 85 and then proceeded

to the ramp, which then placed the defendant's car traveling south on I–25.

> I should state that the reason why the sensor on 85 was placed was an attempt to alert the checkpoint to vehicles which normally were using 85 to circumvent the fixed checkpoint.
>
> Upon noticing the vehicle he noticed that it was riding extremely heavy, using his words. That it had Arizona plates and that it was not common to see an automobile with Arizona plates in that vicinity.
>
> And so he then proceeded to follow the vehicle and then he suspected that it might contain illegal aliens, as there was a camper on the pickup, and so therefore he stopped the vehicle.
>
> ....
>
> [T]hat this is an appropriate and proper Terry stop....

Additionally, the district court held that the subsequent search was proper. Appellant now challenges the legality of both the stop of the vehicle and the resulting search. Because we reverse the district court on the issue of the investigatory stop, we do not address the propriety of the search.

## II

This case returns the court to familiar geographic and legal territory; we have frequently been called upon to assess the legality of investigatory stops made by the Border Patrol near the New Mexico–Mexico border. *See, e.g., United States v. Pollack,* 895 F.2d 686 (10th Cir.1990); *United States v. Merryman,* 630 F.2d 780 (10th Cir.1980); *United States v. Leyba,* 627 F.2d 1059 (10th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980); *United States v. Sperow,* 551 F.2d 808 (10th Cir.), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977).

An investigatory stop need not be supported by probable cause. *United States v. Espinosa,* 782 F.2d 888 (10th Cir.1986). However, Border Patrol "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts,

that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (extending *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to the border context). Stated alternatively, an investigatory stop is justified when an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884.

■ In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded. 422 U.S. at 884–85, 95 S.Ct. at 2581–82. Additionally, an "officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id.* at 885, 95 S.Ct. at 2582 (citing *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883).

In *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Supreme Court provided further direction for applying the *Terry/Brignoni–Ponce* standard:

> Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the de-

taining officers must have a particularized and *objective* basis for suspecting the particular person stopped of *criminal* activity.

449 U.S. at 417–18, 101 S.Ct. at 695 (emphasis added).

■ Incorporating the "totality of the circumstances" relied upon by appellees in support of the instant stop, we fashion the reasonable-suspicion question before us as follows: Whether the Border Patrol agents operating the Truth or Consequences checkpoint may stop every heavily loaded pickup truck bearing a camper shell and out-of-state license plates that travels northbound on this stretch of Highway 85 at 7:30 p.m. For the reasons outlined below, we believe the question must be answered in the negative.

Appellee places considerable significance on the fact that appellant was intercepted while traveling northbound on Highway 85. To be sure, all parties agree that it is possible to bypass the permanent checkpoint by traveling Highway 85. However, due to the state of the record before us, this fact represents the sum total of our knowledge about this stretch of highway. The record is barren of information describing the origins of Highway 85 in this area and thus fails to instruct us as to the types of legitimate traffic that might be expected to make use of the road at this time of day.

For all the record reveals, this stretch of Highway 85 might be the sole artery connecting the city of Truth or Consequences to northbound I–25, or it may represent a primary means of access from I–25 to Elephant Butte Reservoir.[1] We certainly are not willing to assume without some evidence that "old" Highway 85 is some decaying dirt road or that checkpoint circumvention is its lone practical utility. Accordingly, we cannot conclude that Highway 85 has no significant legitimate traffic during the early evening hours. In short, the record does not provide us a basis for concluding that a vehicle's presence on Highway 85 at 7:30 p.m. is at all unusual, much

---

1. The record does inform us, via Agent Good's testimony, that state road 52 leads to a lake. Thus, it is conceivable that some travelers might use Highway 85 to access state road 52 for recreational purposes.

less that it is suggestive of criminal conduct.[2]

Similarly, the record does not enable us to attach any particular significance to the appearance of Arizona license plates in this area. Although Arizona cars must certainly be less common on this stretch of road than those bearing New Mexico plates, we cannot find any basis in the record from which to conclude that Arizona-plated vehicles are any more likely to be transporting aliens near Truth or Consequences than are vehicles bearing the license plates of New Mexico or, for that matter, Texas or Colorado.

We are also unable to ascribe any significance whatsoever to the driving maneuvers of appellant as he approached Highway 85's intersection with I-25. As Agent Goad testified, three highways—Highway 85, I-25 and state road 52—converge at this point. He admitted that the intersection is confusing and that "[p]eople have gotten lost" there. Thus, any out-of-state traveler might well appear confused approaching the intersection, slow down to determine which exit to take or even make a wrong turn.

Appellee argues that "the truck ... turned south rather than North on [I-25] after spotting the border patrol. This action was considered evasive by the border patrolman." However, appellant's driving behavior simply does not elicit the same types of logical inferences and suspicions as do other "evasive" maneuvers encountered by this court in similar cases. For example in *Pollack*, the appellant's vehicle first approached the Truth or Consequences checkpoint and turned back south on Interstate 25 after asking for directions to the nearest gas station. After responding to two sensor alerts on northbound Highway 85, agents then discovered the appellant's vehicle leading a second vehicle that later was found to be carrying contraband. Based on the record before it, the *Pollack* court referred to the use of a "scout" car in this fashion as "a classic alien smuggling pattern." 895 F.2d at 687, 689. Similarly, in *Merryman* the Border Patrol officer made an investigatory stop after observing a pickup truck make a direct U-turn just prior to reaching a permanent checkpoint. 630 F.2d at 781.

More importantly however, we find that the inferences drawn here by Agent Goad from the fact that appellant turned south at the intersection cannot withstand rational analysis. Revisiting Goad's testimony, he asserted:

It's not an uncommon practice for aliens or alien smugglers, either case may be, if they see the border patrol vehicle, they will sometimes instead of entering the freeway northbound in the direction they were going, they will continue up the old highway, if they are using Old Highway 85, and enter the freeway southbound, sometimes they will just continue on up Old Highway 85 'til it ends.

---

**2.** By contrast, the record in *Leyba* provided this court with evidence with which to weigh the significance of a vehicle's presence on another highway in New Mexico at 2:55 a.m.:

U.S. Highway 180 is considered a major artery for smuggling undocumented aliens from Mexico, northward. During the year prior to Leyba's arrest, 1,163 undocumented aliens were apprehended on Highway 180. Agent Martinez testified that the majority of alien trafficking on Highway 180 took place between 2:00 a.m. and 7:00 a.m.—hours during which traffic at the point of the stop averaged only one or two cars during the entire period. (Leyba testified that he had not seen any cars on Highway 180 in the hour before he was stopped.) In contrast, the average daily traffic on Highway 180 from Silver City to the Route 78 turnoff was 1,031 vehicles per day in 1978. Just southeast of Cliff, New Mexico, there averaged 1,071 vehicles per day; at the town of Cliff on Highway 180 an average of 1,473 vehicles per day was observed, and just north of Cliff, New Mexico, traffic on Highway 180 averaged 878 vehicles per day. Of these vehicles, 14.1% were passenger cars with out-of-state license plates. Officer Martinez, based on past experience, estimated that fifty percent of the smugglers apprehended were driving vehicles bearing out-of-state plates.

627 F.2d at 1061 (footnote included parenthetically). Similarly, in *Sperow*, we affirmed the stop of a vehicle traveling a mile and one-half from the Mexico border at 2 a.m. in part because "testimony showed that the ranchers in the area were not prone to drive the roads in question at 2 a.m. so that it was inferable that the vehicle had passed the border." 551 F.2d at 810–11.

... [I]f they see the border patrol vehicle ... [aliens or alien smugglers] do a little bit of everything.

In other words, no matter which direction appellant might have traveled upon reaching the intersection—north on I–25, south on I–25 or straight ahead on Highway 85—his actions would have been "suspicious" to Agent Goad. Plainly, not every suspicion that is "articulable" is reasonable.

We are left to consider the fact that appellant was traveling in a pickup truck with a camper shell and that the vehicle was "riding heavy." While these facts represent two significant factors detailed in *Brignoni–Ponce*, they are not automatic indicia of criminal conduct. A pickup truck with a camper shell has any number of legitimate uses—commercial, agricultural and recreational—that may periodically require the transportation of heavy cargo.

Accordingly, we consider it fatal to the legality of the instant stop that the evidence as to these particular aspects of the vehicle has not been supplemented by record evidence of any other salient factors tending to support a reasonable suspicion. As we have demonstrated, the record is silent as to the characteristics of the area in which the vehicle was encountered, the proximity of the area to the border, the usual patterns of traffic on the particular road and information about recent or expected illegal immigrant activity in the area. Additionally, the record does not provide details of the agent's previous experience with alien traffic beyond Agent Goad's suggestions that "sometimes" alien smugglers use pickups with camper shells and "sometimes" they travel Highway 85. As such, the record fails to provide the "whole picture" necessary to justify the stopping of *this* heavily loaded pickup truck on *this* road at *this* time of day.[3] Were we to conclude otherwise based on this record, we would effectively emasculate the *Terry/Brignoni–Ponce* standard in this circuit and render suspect and subject to stop every heavily loaded out-of-state vehicle traveling this stretch of roadway that is capable of transporting and concealing human beings.

Accordingly, we hold that the totality of the specific articulable facts presented in this case, together with the rational inferences to be drawn therefrom, do not reasonably warrant suspicion that appellant's vehicle contained persons illegally in the country.

The decision of the district court is REVERSED.

BARRETT, Senior Circuit Judge, dissenting:

I must respectfully dissent.

While I agree with the majority that the government has failed in this case to provide us with facts indicating the incidence of illegal alien and/or drug smuggling activity in the Truth or Consequences, New Mexico, area giving rise to Border Patrol officers' suspicions of criminal activity *based on experience*, still it is my view that there is no reasonable basis for reversal of the district court's order denying appellant's motion to suppress evidence of the 220 pounds of marijuana confiscated from the rear section of appellant's pickup vehicle.

Border Patrol Agent Goad testified that: he had twenty-three (23) years of experience; Highway 85 is commonly used to by-pass the Border Patrol checkpoint maintained on Interstate 25 near Truth or Consequences, New Mexico; Highway 85 runs parallel to Interstate 25 near Truth or Consequences, New Mexico; he observed appellant's Chevrolet S–10 pickup with a camper shell traveling north at about 7:30 p.m. on Highway 85 and thereafter observed that the vehicle was "riding extremely heavy" in the rear; he had previously discovered undocumented aliens concealed in pickup trucks with camper shells.

I submit that an experienced Border Patrol officer such as Agent Goad would,

---

3. We do not suggest that a sufficient documentation in the record of an agent's reasonable suspicion must contain any particular number or combination of the factors suggested in *Brig-* *noni–Ponce.* We simply hold up those factors as a benchmark by which to demonstrate the woeful lack of information submitted to support the instant stop.

under the facts and circumstances recited above, reasonably suspect criminal activity justifying the minimal intrusion of an investigatory stop. I agree with the district court's finding that Agent Goad had a reasonable, articulable suspicion that appellant Monsisvais was involved in smuggling illegal aliens, and that this was sufficient to justify the minimal intrusion of a *Terry* (*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) stop. In *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), the Supreme Court observed:

> The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' In evaluating the validity of a stop such as this, we must consider the 'totality of the circumstances—the whole picture.' *United States v. Cortez*, 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981). As we said in *Cortez:*

> > The process does not deal with hard certainties. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. *Id.* at 418 [101 S.Ct. at 695].

*United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) holds that the Border Patrol's routine stopping of all vehicles at a permanent checkpoint located on a major highway away from the Mexican border for brief questioning of the vehicle's occupants is consistent with the Fourth Amendment. The Court observed that:

> Maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border.... Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb to the lure of such highways.... A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to

be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens.

428 U.S. at 556–557, 96 S.Ct. at 3082.

*Almeida–Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) held that roving patrols maintained by the Border Patrol as supplements to the checkpoint system were not empowered to effect random stops and searches simply because a vehicle was in the general vicinity of the border. The Court did not specifically address the "stop" aspect of the case, but did hold that the subsequent search, conducted without consent or probable cause, was violative of the Fourth Amendment.

In the instant case, it is agreed that Agent Goad was operating a fixed Border Patrol checkpoint on Interstate 25 to check northbound traffic when the sensor alarms on adjacent Highway 85 were alerted, indicating that a vehicle was traveling northbound on Highway 85 at 7:30 p.m. Agent Goad looked over to Highway 85 and observed appellant's vehicle traveling northbound. It was dark enough to require headlights. Agent Goad then drove in his Border Patrol vehicle, accompanied by another agent, to an area close by to intercept appellant's vehicle. He then identified appellant's vehicle as a pickup with a camper shell "riding extremely heavy" in the rear. He also noted that the pickup bore Arizona license plates.

Under these circumstances, it seems to me that the stop of appellant's vehicle on Highway 85 was the functional equivalent of the fixed checkpoint stop on Interstate 25. If so, no articulable suspicion is required to effect the stop. In *United States v. Pollack*, 895 F.2d 686, 687 (10th Cir. 1990), we referred to testimony of Border Patrol Agent Sanchez that "[H]ighway 85 is a well-documented alien smuggling route" and that many "alien smuggling loads" have been apprehended on that route. The district court specifically found that Highway 85 is a well-documented alien

smuggling route. *Id.* at 688. This court adopted that finding. *Id.* at 690.

The United States Supreme Court has upheld roadblock stops and brief detentions for the purpose of verifying driver licenses and automobile registrations, *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) and to detect and deter drunk driving. *Michigan Department of State Police v. Sitz,* — U.S. —, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz,* the majority pertinently observed:

> No one can seriously dispute the magnitude of the drunken driving problem or the states' interest in eradicating it. . . . Conversely, the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at sobriety checkpoints—is slight. We reached a similar conclusion as to the intrusion on motorists subjected to a brief stop at a highway checkpoint for detecting illegal aliens. *See Martinez–Fuerte, supra,* at 558 [96 S.Ct. at 3083].

— U.S. at —, 110 S.Ct. at 2485–86.

Immigration officers and United States Customs agents are charged with the duty of protecting the United States from the entry of illegal aliens and contraband. The magnitude of the problem of detection of illegal aliens and contraband at or near our borders is beyond dispute.

I would affirm.