**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David Joe MARTIN, Defendant–Appellant.**

No. 92–2240.

United States Court of Appeals, Tenth Circuit.

Jan. 10, 1994.

Order Granting Rehearing Feb. 10, 1994.

Joseph (Sib) Abraham, Jr., El Paso, TX, for defendant-appellant.

David N. Williams (Larry Gomez, U.S. Atty., and Judy A. Patton, Asst. U.S. Atty., on the brief), Las Cruces, NM, for plaintiff-appellee.

Before KELLY, GODBOLD *, and BARRETT, Circuit Judges.

BARRETT, Senior Circuit Judge.

David Joe Martin (Martin) appeals from the judgment and sentence entered following a jury trial and his conviction of possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2, charged in Count I, and carrying and using a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c), charged in Count II. Martin was sentenced to sixty (60) months imprisonment followed by four years of supervised release on Count I and sixty (60) months imprisonment followed by three years of supervised release on Count II, the imprisonment terms to be served consecutively and the supervised release terms to be served concurrently.

Prior to trial, Martin and co-defendant Robert George Wood moved to suppress physical evidence and statements. Following a hearing, the motions were denied by the district court via detailed findings of fact and conclusions of law. Martin failed to include a transcript of the suppression hearing as part of his appendix on appeal. *See* Fed.R.App.P. 30(a); 10th Cir.R. 30.1.1 referencing 10th Cir.R. 10.3 and in particular 10.3.2(d). While we have discretion to supplement the record before us, *Lyons v. Jefferson Bank & Trust,*

---

* The Honorable John C. Godbold, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

994 F.2d 716, 728 n. 10 (10th Cir.1993); *United States v. Tranakos*, 911 F.2d 1422, 1426 n. 3 (10th Cir.1990), we decline to do so. *See United States v. Vasquez*, 985 F.2d 491, 494–95 (10th Cir.1993). Martin has not challenged the findings of fact by the district court. Accordingly, we rely on and adopt the district court's findings of fact:

### Findings of Fact

1. The United States Border Patrol operates three permanent checkpoints in southern New Mexico; the I–25 checkpoint north of Las Cruces, the Highway 185 checkpoint north of Las Cruces, and the I–10 checkpoint west of Las Cruces, New Mexico. United States Border Patrol agents are assigned to work at each of the checkpoints on a rotating basis. All checkpoints are not open for operation at the same time or on a twenty-four-hour basis but are open as manpower permits.

2. As part of routine checkpoint procedures, agents patrol roads in the vicinity of the checkpoint to which they are assigned. The purpose of this roving patrol is to look for undocumented aliens walking around the checkpoint and for suspicious vehicles.

3. New Mexico Highway 185 is a well-documented smuggling route for aliens and narcotics.

4. New Mexico Highway 185 is situated roughly parallel to I–25 on the western side of the interstate. Highway 185 proceeds from the border area north through rural New Mexico. The road is a two-lane highway that circumvents the checkpoint on I–25. The checkpoint on Highway 185 is located immediately off the roadway. A motorist traveling on Highway 185 would know whether the checkpoint is open or closed by the absence or presence of vehicles, cone markers, and personnel.

5. There are few businesses on Highway 185 around the area of the checkpoint. South of the checkpoint, there is the Blue Moon Bar, and there is a Mercantile store several miles south of the Bar. The road is used by many farmers and agricultural workers.

6. On January 23, 1992, at approximately 5:05 p.m., the defendant Robert Wood drove a 1991 Dodge pickup truck into the checkpoint on I–25. Mr. Wood was alone in the vehicle.

7. Agent Miguel Estrada motioned for Mr. Wood to stop before the place vehicles normally stop to allow another agent to cross the roadway. Mr. Wood failed to stop where Agent Estrada indicated, but he did stop at the stop sign where vehicles are normally required to stop.

8. Mr. Wood appeared to be in a hurry. After Agent Estrada verified that Mr. Wood was a United States citizen, he asked Mr. Wood where he was coming from. Mr. Wood responded that he was coming from Anthony and then volunteered that he was going to Hatch to look for hay. Agent Estrada then permitted Mr. Wood to leave the checkpoint. It is unusual for persons questioned at the checkpoint to volunteer information.

9. Agent Francisco Velasco was also on duty at the I–25 checkpoint at the time Mr. Wood entered and left the checkpoint. Just after Mr. Wood left, Agent Velasco also left the checkpoint and proceeded southbound to assist an officer on I–25 south of the checkpoint. Before he arrived to help the officer, he learned by radio he was no longer needed. He then decided to patrol Highway 185. Agent Velasco proceeded west on Highway 157, and north on Highway 185 toward the checkpoint, which was not opened that date. Agent Velasco was in a marked United States Border Patrol vehicle and was in uniform. At approximately milemarker 17, south of the Highway 185 checkpoint, the agent passed Mr. Wood's vehicle at milemarker 17, traveling southbound at an excessive rate of speed, at least 75 miles per hour.

10. Mr. Wood's vehicle would have had to pass the checkpoint on Highway 185 in order to get from the I–25 checkpoint to where Agent Velasco saw him.

11. Agent Velasco recognized Mr. Wood's vehicle from the I–25 checkpoint and radioed to Agent Estrada at the I–25 checkpoint.

12. There was not enough time for Mr. Wood to have travelled from the I–25 checkpoint to Hatch and back to the point

on Highway 185 where Agent Velasco saw him even though he was travelling at a high rate of speed.

13. Agent Estrada advised Agent Velasco that the driver had claimed he was going to Hatch to look at hay. He also advised Agent Velasco there was no way the driver could have gone to Hatch in that amount of time. Agents Velasco and Estrada believed the vehicle was a scout vehicle for a load of undocumented aliens or narcotics. The function of the scout vehicle is to view the checkpoints to see if they are open, determine if a trained dog is on duty, and to determine whether roving patrol is operating in the area. The scout vehicle communicates with the load vehicle before the load vehicle travels north to the checkpoints.

14. Agent Velasco made a u-turn on Highway 185, and proceeded southbound. When he arrived at the Blue Moon Bar, he observed Mr. Wood's vehicle parked in the parking lot. He looked in the parking lot for a vehicle which could be the "load" vehicle connected to the suspected scout vehicle. Agent Velasco observed that there were five cars and one pickup truck in addition to Mr. Wood's vehicle. The pickup truck was a Chevrolet with a camper shell. Agent Velasco noticed that the Chevrolet had been packed so that miscellaneous goods were stacked at the rear of the bed, with room in the bed of the truck which could be used to conceal undocumented aliens or narcotics. This method of packing was consistent with the appearance of pickup trucks from which Agent Velasco has apprehended narcotics or undocumented aliens. This method of packing is also consistent with innocent behavior. Agent Velasco also noticed that both of the pickup trucks in the parking lot had CB antennae, which indicated to him that the occupants could communicate with one another. No other vehicle in the parking lot appeared to Agent Velasco to be a possible load vehicle.

15. Agent Velasco passed the Blue Moon Bar and traveled south. He then made another u-turn and returned northbound on Highway 185 to the Bar. As he approached, he saw Mr. Wood's vehicle about to exit the parking lot in a southerly direction. The Chevrolet was also moving, following Mr. Wood's truck. Mr. Wood did not leave the parking lot until Agent Velasco passed him. The driver of the Chevrolet jerked the truck to a stop.

16. Agent Velasco passed the Bar and proceeded north toward the Highway 185 checkpoint. The trucks proceeded southbound. Agent Velasco made another u-turn and watched the trucks. He observed the trucks creeping southbound along Highway 185, traveling approximately 5–10 miles per hour. Mr. Wood's vehicle was first, the Chevrolet followed.

17. As Agent Velasco pulled closer to the vehicles, Mr. Wood accelerated and pulled away from the suspected load vehicle. Agent Velasco believed Mr. Wood was attempting to act as a decoy, to lure the agent away from the load vehicle. Agent Velasco had previously encountered this phenomenon of the decoy. Agent Velasco radioed the I-25 checkpoint for backup assistance.

18. Agent Velasco pulled around the Chevrolet to pursue Mr. Wood's vehicle. As he passed the Chevrolet, he could see into the vehicle. He observed a covering over the bed of the truck, where the goods were not packed. Agent Velasco believed either aliens or narcotics could be concealed in the area in the Chevrolet, but the truck did not appear to be riding low. The back of the truck appeared loaded with personal gear, riding gear, and ropes. The agent passed the Chevrolet and pursued the lead vehicle. Agent Velasco activate his emergency lights and stopped Mr. Wood at the Leasburg Mercantile store. He quickly determined the identity of the driver, Robert Wood. Mr. Wood was extremely animated at roadside. He yelled at the agent, and was generally upset at having been stopped. Agent Velasco advised Mr. Wood he believed he was the scout vehicle for a load of aliens or narcotics, and that he should stay at that location. Mr. Wood's demeanor changed dramatically; he became quiet. Agent Velasco believed this to be nervous or guilty behavior. Agent Velasco took Mr. Wood's

driver's license and registration, and returned north to retrieve the suspected load vehicle. As the agent left the area of the stop, he observed Mr. Wood throw his hands down as if in disgust, then crossed his arms and leaned against his truck.

19. Mr. Wood was not free to leave the area.

20. Within minutes, Agent Velasco located the Chevrolet still slowly traveling southbound. He turned around and activated his emergency lights. The driver did not respond until he pulled into the Mercantile store area where Mr. Wood was already waiting. Mr. Wood had waited approximately three minutes at roadside before Agent Velasco returned with Mr. Martin's vehicle.

21. Agent Velasco parked his patrol car in front of Mr. Martin's vehicle so that Mr. Martin would not attempt to flee. The agent went up to the window of Mr. Martin's vehicle and identified himself. He asked Mr. Martin where he was coming from, and Mr. Martin replied he had come up from Anthony to drink a beer. When asked if he lived in Anthony, Mr. Martin replied he did not live there but had been there for a roping contest.

22. Agent Velasco asked each man out of the presence of the other if he knew the other man. Both men replied in the negative. Then the agent had the men look at each other, and he asked them again in they knew each other. The men answered, "No," but they appeared to be avoiding eye contact. They appeared nervous to the agent.

23. Agent Velasco advised both subjects he believed Mr. Martin was transporting aliens or narcotics under the bed in the back of his truck and that Mr. Wood was Mr. Martin's scout vehicle.

24. Agent Velasco asked for permission to search the trucks. Mr. Wood readily consented. Mr. Martin stated the agent could search the cab, but not the bed, because that was where he lived. Agent Velasco stated he would call for a canine to conduct an inspection of the exterior of Mr. Martin's truck. The length of detention from the first stop until this point was

approximately four minutes. Mr. Martin was not free to leave the area.

25. Agent Estrada arrived at the scene at about 6:00 p.m., approximately ten to fifteen minutes later. The canine and his handler, Agent Thatcher, arrived approximately six minutes after that.

26. The canine inspected Mr. Martin's vehicle, and within thirty seconds the canine alerted. The alert indicated to Agent Thatcher that either contraband or humans were concealed. The agents informed Mr. Wood and Mr. Martin that the dog had alerted. The agents then opened the back of Mr. Martin's camper shell and smelled marijuana. Agent Velasco retrieved a package of marijuana from the vehicle, and the agents placed both men under arrest. Agent Estrada advised both men of their rights under the *Miranda* decision.

27. The canine also inspected Mr. Wood's vehicle and alerted to the front area of the cab. The agents then searched the cab and found no aliens or contraband. The alert indicated there had once been drugs in the cab.

28. The defendants were each detained at roadside approximately thirty minutes prior to the canine alert.

(Appellant's Appendix, Tab 3 at 1–9).

A search of Martin's pickup revealed approximately 495 pounds of marijuana concealed therein.

Martin proceeded to trial, during which the district court denied his motion to sever Counts I and II, and his proffered instruction on his defense theory that "mere transportation of a firearm is not within the purview of § 924(c)(1)." (Appellant's Opening Brief at 20).

On appeal, Martin contends that: (1) the discovery of the marijuana was the result of an illegal search and seizure; (2) the district court erred in failing to grant a severance of counts; and (3) the district court erred in failing to give his requested jury instruction.

## I.

Martin contends that the discovery of marijuana was the result of an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution.

■ Martin acknowledges that we must accept the district court's findings of fact unless clearly erroneous, *United States v. Barbee*, 968 F.2d 1026, 1028 (10th Cir.1992), and that "[t]he ultimate determination of reasonableness under the fourth amendment is . . . a conclusion of law we review de novo." *United v. Venzor–Castillo*, 991 F.2d 634, 636 (10th Cir.1993). On appeal, we view the evidence in the light most favorable to the district court's ruling. *United States v. Soto*, 988 F.2d 1548, 1551 (10th Cir.1993).

The parties agree that the proper standard for determining whether a border patrol officer has reasonable suspicion to stop a vehicle was set forth in *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). There, the Court opined that "[e]xcept at the border and its functional equivalents, officers on roving patrols may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." The parties further agree that the factors which should be taken into account under *Brignoni–Ponce* include: the characteristics of the area in which the vehicle is stopped; patterns of traffic on the road; proximity to the border; previous experience with alien traffic in the area; information about recent border crossing; attempts to evade detection; appearance of the vehicle; appearance and behavior of the driver and passengers; and other relevant information.

The parties disagree, however, as to whether the border patrol agents in our case had reasonable suspicion, based on "specific articulable facts, together with rational inferences from those facts," to stop Martin.

Martin argues that *United States v. Guillen–Cazares*, 989 F.2d 380 (10th Cir.1993), *United States v. Casteneda*, 951 F.2d 44 (5th Cir.1992), *United States v. Miranda–Enriquez*, 941 F.2d 1081 (10th Cir.1991), *United States v. Monsisvais*, 907 F.2d 987 (10th Cir.1990), *United States v. Pollack*, 895 F.2d 686 (10th Cir.1990), *cert. denied*, 498 U.S. 985, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990), and *United States v. Abdon–Limas*, 780 F.Supp. 773 (D.N.M.1991), "each give ample support that Velasco lacked reasonable suspicion for the detention of his vehicle." (Appellant's Opening Brief at 17). The government responds that "the facts of this case remove it from the control of the cases [relied upon by Martin] where the Court has found no reasonable suspicion to stop the vehicles," (Brief of Appellee at 21), and "place it within the control of *Pollack*, and *United States v. Barbee*, 968 F.2d 1026 (10th Cir.1992), where the records were substantial and the agents explained their actions." *Id.* We shall consider each of these cases in turn.

In *Pollack*, experienced Border Patrol Agents had observed a pickup "originally [go] through the checkpoint, [find] a reason to return to Truth or Consequence, and thereafter . . . come back north through the smuggling route, followed by Pollack, circumventing the checkpoint in a classic alien smuggling pattern." 895 F.2d at 690. In that case, we held that the agents, armed with such knowledge, and having observed Pollack driving a large vehicle capable of hauling a large number of people following the pickup between 3:00 and 3:45 a.m. on a well-documented alien smuggling route during a time when traffic was very unlikely on Highway 85 and at an hour when a very, very small percentage of the traffic stopped on Highway 85 was legitimate, had reasonable suspicion to stop him.

In *Monsisvais*, "we fashion[ed] the reasonable-suspicion question . . . as . . . [w]hether the Border Patrol Agents operating the Truth or Consequences checkpoint may stop every heavily loaded pickup truck bearing a camper shell and out-of-state license plates that travels northbound on this stretch of Highway 85 at 7:30 p.m." 907 F.2d at 990. In holding that agents could not, we observed that the record on appeal was "barren of information describing the origins of Highway 85 in this area and thus fails to instruct us as to the types of legitimate traffic that might be expected to make use of the road at

this time of day," *id.*, and "[i]n short, the record does not provide us a basis for concluding that a vehicle's presence on Highway 85 at 7:30 p.m. is at all unusual, much less that it is suggestive of criminal conduct." *Id.* at 990–91. We distinguished *Pollack*, noting:

> Appellee argues that "the truck ... turned south rather than North on [I–25] after spotting the border patrol. This action was considered evasive by the border patrolman." However, appellant's driving behavior simply does not elicit the same types of logical inferences and suspicions as do other "evasive" maneuvers encountered by this court in similar cases. For example in *Pollack*, the appellant's vehicle first approached the Truth or Consequences checkpoint and turned back south on Interstate 25 after asking for directions to the nearest gas station. After responding to two sensor alerts on northbound Highway 85, agents then discovered appellant's vehicle leading a second vehicle that later was found to be carrying contraband. Based on the record before it, the *Pollack* court referred to the use of a "scout" car in this fashion as "a classic alien smuggling pattern."

907 F.2d at 991.

In *Miranda–Enriquez*, we interpreted the government's view to be that "every out-of-state driver traveling on New Mexico Highway at 9:00 p.m. with a dusty car who does not turn her or his head to look for oncoming cars at the intersection of Highway 52, I–25, and U.S. Highway 85, 98 miles from the Mexican border, can be stopped and questioned by the Border Patrol." 941 F.2d at 1083. In that case, we followed *Monsisvais* in holding that we could not, based on the record before us, hold that the "facts and the rational inferences flowing from them ... amount[ed] to a basis for a reasonable suspicion to stop [the defendant] for questioning...." 941 F.2d at 1084. Significant to our holding was the arresting agent's testimony that he did not know what the likelihood of smugglers traveling on the road at 9:00 p.m. would be, and evidence which "show[ed]" that the route upon which Mr. Miranda–Enriquez traveled was legitimately used by tourists departing from the nearby lake." *Id.*

In *Casteneda*, the court held that a roving Border Patrol agent, having detected the faint odor of marijuana emanating from the defendant's truck while following the truck in his patrol car, had reasonable suspicion to stop the truck. The court observed that its "decision today is driven by a limited record," 951 F.2d at 48, and cautioned that:

> ... before he [Agent Moreno] smelled the marijuana, Moreno had no better reason to surmise that Castenada was engaged in criminal activity that he did to suspect the driver of any other vehicle on the road that night. To say that at this point [before he smelled the marijuana] the agent had a reasonable suspicion, sufficient to justify a roving border patrol investigatory stop, would be to say that he could have stopped any vehicle on that road simply because smuggling was common on the road, because the road was fairly close to the Mexican border, and because the road happened to bypass two U.S. border checkpoints.

951 F.2d at 47 n. 4.

In *Abdon–Limas*, the district court, after reviewing our decisions in *Pollack*, *Monsisvais*, and *Miranda–Enriquez*, concluded, in granting the defendant's motion to suppress:

> ... given the Tenth Circuit case law and the totality of the circumstances in this case, I am precluded from concluding that every out-of-state vehicle traveling north on 185 at mid-day which dramatically slows down when approached by a border patrol vehicle and which contains occupants who appear to consciously avoid looking at the border patrol vehicle, can be stopped and questioned by the border patrol.

780 F.Supp. at 780.

In *Guillen–Cazares*, after noting the factual distinctions in that case and *Pollack*, we held:

> Viewing the totality of the circumstances, we are left to consider the fact the defendant was travelling at night on a known smuggling road, with one passenger, in a vehicle which slanted to the rear and was following a car with several pas-

sengers. These articulated facts, and the fact the passenger slouched down at some point after the car entered I–25 south, together with the rational inferences from the facts, do not reasonably warrant suspicion the defendant's vehicle was smuggling aliens or narcotics.

989 F.2d at 384.

In *Barbee,* we held that Border Patrol agents had reasonable suspicion to stop defendants' vehicle based on the following facts:

... the vehicle was traveling northbound on a highway known to be commonly used by alien and drug smugglers because its avoids the Truth or Consequences border checkpoint; the vehicle had out-of-state, Texas license plates; it was traveling in the evening, after dark; the time of the year was February, a month when typically little traffic travels that road; there were several occupants in the car; and when the agent's headlights lit up the car the passengers in the back seat crouched down. We conclude that these factors support a finding of reasonable suspicion to stop the vehicle. *See Pollack....*

968 F.2d at 1029.

Also in *Barbee,* after observing that "[o]ur holding is not in conflict with ... *Monsisvais* ... [which] emphasized the inadequacy of the evidence in the record," id., we observed:

The record in the instant case could have been stronger but is not as incomplete as *Monsisvais.* The record contains testimony and the qualifications of two different agents with experience in the area. They explained the location of the road, the typical nature of the traffic at that time of year and that time of day of old Highway 52, and their experience with alien and drug smugglers. Also important is that the agent making the stop observed the passengers sinking down in an apparent effort to avoid detection; such behavior is suspicious conduct not clearly susceptible to unsuspicious interpretations, unlike passengers merely avoiding eye contact, turning their heads away from a light, or shielding their eyes.

On the record before us, considering the passengers' conduct, the usual traffic pat-

terns and the characteristics of old Highway 52, the investigative stop was proper. 968 F.2d at 1029–30 (Citations omitted).

■ Considering these cases in the aggregate, it is clear that: border patrol stop cases are fact driven and must be considered on a case-to-case basis; reasonable suspicion to stop will not be imputed from a barren record; and, in the absence of a well developed record, law enforcement officials cannot infer criminal conduct from otherwise innocent travel.

■ The concept of reasonable suspicion is not subject to uniform definition. In *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989), the Court opined:

The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' ... In evaluating the validity of a stop such as this, we must consider the 'totality of the circumstances—the whole picture.' *United States v. Cortez,* 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981). As we said in *Cortez:*

The process does not deal with hard certainties. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. Id. at 418, 101 S.Ct. at 695.

■ In considering the "whole picture" in our case, which is unlike *Monsisvais* and *Miranda–Enriquez* where we were faced with barren or limited records, we are fortunate to have the district court's extensive and unchallenged findings of fact detailing the circumstances involving the Martin stop: agents routinely patrol roads in the vicinity of check points, looking for suspicious vehicles; Highway 185 is a well-documented smuggling route for aliens and narcotics, situated roughly parallel to I–25 circumventing the I–25 checkpoint; Highway 185 has a checkpoint located immediately off the road; there are few businesses on Highway 185 around the area of the checkpoint and the

road is used by many farmers and agricultural workers; when co-defendant Wood went through the I–25 checkpoint, he appeared to be in a hurry; Wood volunteered to Agent Estrada that he was going to Hatch to look for hay; it is unusual for people to volunteer information at a checkpoint; Agent Velasco was also on duty at the checkpoint when Wood entered and left; after Wood left, Agent Velasco began patrolling Highway 185; while patrolling Highway 185, Agent Velasco observed Wood traveling southbound on that highway at an excessive speed, at least 75 miles per hour; Agent Velasco, recognizing Wood's vehicle from the I–25 checkpoint, radioed Agent Estrada; Agent Estrada advised Agent Velasco that the driver of the vehicle had related that he was going to Hatch to look for hay but that there was no way the driver could have driven to Hatch and back in that short period of time; the agents believed that Wood was a scout vehicle for a load vehicle carrying undocumented aliens or narcotics; the function of the scout vehicle is to view the checkpoints to see if they are open, determine if a roving patrol is operating in the area, and to communicate with the load vehicle before the load vehicle travels north to the checkpoint; Agent Velasco, northbound on Highway 185 when he observed Wood traveling southbound at an excessive rate of speed, made a u-turn, proceeded southbound and observed Wood's vehicle in the Blue Moon Bar parking lot; Agent Velasco observed the six vehicles in the parking lot and looked for a vehicle which could be a load vehicle for the suspected scout vehicle; Agent Velasco observed that one of the vehicles, a pickup with a camper shell, had CB antennae as did Wood's pickup, indicating to Velasco that the occupants of the two vehicles could communicate with each other; the pickup was packed in a manner consistent with the appearance of pickup trucks from which Agent Velasco had apprehended narcotics or undocumented aliens, but this method of packing was also consistent with innocent behavior; Agent Velasco observed Wood's vehicle leave the parking lot with the second pickup following it; the vehicles were creeping southbound at 5–10 miles per hour; when Agent Velasco pulled up closer to the vehicles, Wood accelerated his vehicle and pulled away from the suspected load vehicle, indicating to Agent Velasco that Wood was acting as a decoy to lure him away from the load vehicle; Agent Velasco had previously encountered the phenomenon of the decoy; when Agent Velasco stopped Wood, Wood was yelling and generally upset for being stopped but he quieted down when Agent Velasco indicated that he believed Wood was acting as a scout vehicle; Agent Velasco believed Wood's mood changed to nervous or guilty behavior; when Agent Velasco left Wood and drove north to retrieve the suspected load vehicle, he observed Wood throw his hands down as if in disgust and then cross his arms and lean against his truck; shortly thereafter when Agent Velasco located the pickup being driven by Martin, it was still slowly traveling southbound on Highway 185; Agent Velasco stopped Martin when he [Martin] pulled into the store parking lot where Wood was waiting.

■ Mindful that the concept of reasonable suspicion cannot be reduced to a "neat set of legal rules," *Sokolow,* and that law enforcement officers, like jurors, are permitted to formulate "certain common sense conclusions about human behavior," *Cortez,* we hold, based upon "the whole picture," *Sokolow,* that the Border Patrol agents had reasonable suspicion to stop Martin.

## II.

■ Martin contends that the district court erred in denying his motion for a severance of counts. As set forth *supra,* Martin was charged in Count I with possession with intent to distribute more than 100 kilograms of marijuana and in Count II with carrying and using a firearm in relation to a drug trafficking offense.

Martin's motion was based on his desire not to testify as to Count I, the substantive drug count, but his desire to testify as to Count II, the gun count. The court denied his motion via a minute order. Martin argues that the court's denial "forced [him] to testify at trial and convict himself as to the drug count in an attempt to win an acquittal of the gun count." (Appellant's Opening

Brief at 18). Martin contends that inasmuch as he "had both important testimony to give concerning one count and a strong need to refrain from testifying on the other," *id.* at 18–19, the district court's refusal to sever the counts deprived him of a fair trial.

The government responds, citing *United States v. Parra,* 2 F.3d 1058, 1062 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993), that a decision to grant or deny a severance will not be disturbed on appeal absent an affirmative showing of an abuse of discretion and that the burden on the defendant in this context is a difficult one. The government argues that inasmuch as the evidence and theories of the two counts were interconnected, the district court did not abuse its discretion in denying Martin's motion to sever Counts I and II.

 An appellant is responsible for insuring that all materials on which he seeks to rely are part of the record on appeal. *United States v. Vasquez,* 985 F.2d 491, 495 (10th Cir.1993). When an appellant asserts that his conviction should be reversed because of a particular error but the record does not permit us to evaluate the claim, we will generally refuse to consider it. *Id.* Here, the record on appeal does not include the trial transcript. Under these circumstances, we have no basis from which to determine whether the district court's denial of Martin's motion for a severance of counts gave rise to an abuse of discretion. *See United States v. Rascon,* 922 F.2d 584, 588 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2037, 114 L.Ed.2d 121 (1991) (where issue of the legality of appellant's detention by the Border Patrol was raised during trial, failure by the appellant to designate the trial transcript precludes review).

### III.

 Martin contends that the district court erred in refusing to give his requested instruction on § 924(c).

Martin argues that his theory of defense was clear: he admitted his guilt as to the substantive drug charge contained in Count I but denied that the weapon found in the vehicle was carried and used during said drug trafficking crime. Accordingly, Martin argues that he was entitled to an instruction on his theory that "mere transportation of a firearm is not within the purview of § 924(c)(1)." (Appellant's Opening Brief at 20). Martin contends that inasmuch as "the other instructions given by the Court as a whole did not sufficiently cover the issues in the case and focus on the facts presented by the evidence," that "a new trial should be granted." *Id.*

 We "examine jury instructions as a whole to determine whether the jury was provided with an accurate statement of the applicable law." *United States v. Self,* 2 F.3d 1071, 1089 (10th Cir.1993), citing, *United States v. Harmon,* 996 F.2d 256, 257 (10th Cir.1993) (citations omitted). We will reverse a conviction due to an erroneous instruction only if the error was prejudicial when viewed in light of the entire record. *United States v. Caro,* 965 F.2d 1548, 1555 (10th Cir.1992).

Although Martin contends that the court erred in refusing to give his proffered instruction on § 924(c), he has failed to include the jury instructions in the record on appeal. Under such circumstances, we cannot consider whether the court's failure to give his proffered instruction gave rise to error. *Vasquez,* 985 F.2d at 494 ("When the record on appeal fails to include copies of the documents necessary to decide an issue on appeal, the Court of Appeals is unable to rule on that issue."); *Southwest Forest Industries, Inc. v. Sutton,* 868 F.2d 352, 356 (10th Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1320, 108 L.Ed.2d 496 (1990) (failure to designate the instructions as part of the record on appeal renders it impossible to review appellant's contention that the trial court failed to properly instruct the jury).

**AFFIRMED.**

### ORDER

Filed February 10, 1994

Appellant's petition for rehearing is granted as to two contentions of error raised on appeal but not addressed in our opinion for want of a trial transcript or jury instruction:

(1) the district court erred in failing to grant a severance of counts, and (2) the district court erred in failing to give a proffered instruction on 18 U.S.C. § 924(c). We deny appellant's petition for rehearing on appellant's contention that the district court erred in denying his motions to suppress, having reached the merits on that issue.

Within ten days of the date of this order, appellant shall transmit those portions of the district court's record appellant deems necessary for our review of the above contentions (1) and (2) to our Clerk's office.